## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

KEITH COOPER,     )
          )
   Plaintiff,    )
          )  Case No.
   v.       )
          )
CITY OF ELKHART, STEVE  )
REZUTKO, EDWARD WINDBIGLER, )
STEVEN AMBROSE, and TOM  )
CUTLER, in their individual capacities, )
          )  **JURY TRIAL DEMANDED**
   Defendants.   )

## COMPLAINT

Plaintiff, KEITH COOPER, by his undersigned attorneys, complain of

Defendants, CITY OF ELKHART, STEVEN REZUTKO, EDWARD WINDBIGLER,

STEVEN AMBROSE, and TOM CUTLER as follows:

### Introduction

1. Plaintiff Keith Cooper spent ten years in prison for an armed-robbery

that he did not commit.

2. Mr. Cooper spent an additional decade of his life fighting his wrongful

conviction after his 2006 release from prison.

3. Mr. Cooper had absolutely nothing to do with the crime and his

wrongful conviction nearly destroyed his life.

4. Every wrongful conviction is tragic in its own right, but Mr. Cooper's is

particularly heartbreaking.  At the time of his arrest, Mr. Cooper was a married

father of three and a provider for his family with gainful employment and no criminal convictions.

5.      His wrongful conviction nearly cost him everything; he lost his liberty and his wife was forced to sell their family's belongings and live in shelters to survive.

6.      Mr. Cooper's wrongful conviction was caused by Defendants' egregious wrongdoing of manufacturing and fabricating all the evidence of his supposed guilt.

7.      Fortunately for Mr. Cooper, the Defendants' misconduct ultimately unraveled.

8.      The eyewitnesses have since come forward, one by one, and revealed the extent of the Defendants' misdeeds while acknowledging that Mr. Cooper was not the person that robbed and shot at them on October 29, 1996.

9.      DNA evidence bolsters their story and conclusively illustrates that Mr. Cooper is innocent and had no involvement in the armed-robbery and attempted murder of Michael Kershner.

10.     Ultimately, Mr. Cooper filed a petition for an actual innocence pardon in 2011.

11.     On February 9, 2017, Governor Holcomb exonerated Mr. Cooper through the first actual innocence pardon ever awarded in Indiana.

12.     This lawsuit seeks to bring the injustice that happened to Mr. Cooper to light so that it will never occur again.

2

## Jurisdiction

13.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

14.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b).  The Defendants reside in this district and the events and omissions giving rise to Plaintiff's claims occurred in this district.

## Parties

16.     Plaintiff Keith Cooper is a 50-year-old resident of Country Club Hills, Illinois.  Mr. Cooper is married and a father of three children.

17.     At all times relevant hereto, Defendants Steve Rezutko, Edward Windbigler, Steve Ambrose, and Tom Cutler (hereinafter "Defendant Officers") were police officers in the Elkhart Police Department.  All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation at issue.

18.     Defendant City of Elkhart is a municipal corporation under the laws of the State of Indiana.  The City of Elkhart is liable for all torts committed by the Defendant Officers while employed by the City of Elkhart pursuant to the doctrine of *respondeat superior*.  Defendant City of Elkhart is additionally responsible for the

official policies of the Elkhart Police Department.  The City of Elkhart is or was the employer of each of the Defendant Officers.

## The Crime

19.     During the evening of October 29, 1996, Michael Kershner was watching a movie in his family's apartment on Monroe Street in Elkhart, Indiana. Also present was Kershner's girlfriend Jennifer Dolph, his friend Eddie Love, his mother Nona Canell, and her boyfriend Jason Ackley.

20.     Around 9:30 P.M., Mr. Kershner received a phone call from his sister Christina Smallwood.  At the same time, someone began knocking on Mr. Kershner's door.

21.     When Mr. Kershner opened the door, two African-American males, one short and one tall, forced their way into the apartment.  Both were armed with handguns.  The intruders demanded money, drugs, and asked for "Shell."

22.     Shortly thereafter, Mr. Kershner lunged for his SKS rifle, which was laying by his side.

23.     A scuffle ensued between Mr. Kershner and the tall intruder.  During the scuffle, Mr. Kershner managed to knock off the tall intruder's hat.

24.     At one point, the tall intruder shot Mr. Kershner in the hip. The two intruders left shortly thereafter, taking a bag full of quarters, a stun gun, and Mr. Kershner's SKS rifle.

25.     Ms. Canell and the others took Mr. Kershner to the Central Elkhart fire station, where the police were called and Mr. Kershner was transported to Elkhart General Hospital.

26.     Following multiple surgeries, Kershner survived the gunshot wounds.

27.     Upon information and belief, Defendant Cutler assigned Defendant Rezutko as the lead investigator for the subsequent investigation.  Upon his assignment as lead investigator, Defendant Rezutko directed additional units to go to the apartment and secure it.

28.     Mr. Cooper had absolutely nothing to do with this heinous crime.  He knew none of the individuals involved and had never been to this apartment in his life.

### Defendant Rezutko Frames Christopher Parish
### Within 48 Hours of Beginning His Investigation

29.     Christopher Parish was also wrongly convicted of the armed-robbery of Mr. Kershner.

30.     In October 1996, Mr. Parish lived in Elkhart and was working at his own tow truck service business.

31.     In the evening hours of October 29, 1996, Mr. Parish and his family attended a family gathering in Chicago, Illinois.  Corroborated by twelve witnesses, Mr. Parish left Elkhart in the afternoon and arrived back at his home in Elkhart after midnight.

32.     Mr. Parish was not in Elkhart at the time of the Kersnher shooting and had never seen Kershner in his life.

33.     Mr. Parish first came to Defendant Rezutko's attention for one reason: he received a police report which memorialized an interview on October 29, 1996 conducted by Defendant Windbigler with Eddie Love, a witness who was in the apartment and witnessed the shooting.

34.     In that conversation, Mr. Love told Defendant Windbigler that he saw the two individuals involved the shooting in the past but did not know their names.

35.     After receiving this report, Defendant Rezutko went to meet Mr. Love.

36.     In that conversation, Mr. Love adamantly maintained to Defendant Rezutko that he did not know the names of the individuals.

37.     Nevertheless, Ruzutko pressed Love to describe the assailants and Love eventually stated that one of them bore a physical resemblance to someone that he did know, Mr. Parish.

38.     Put another way, Mr. Love told Defendant Rezutko that he did not know the two black males who committed the crime and that neither one was Mr. Parish, who he knew.

39.     Undeterred by Mr. Love's version of events, Defendant Rezutko coerced and put substantial pressure on Mr. Love to falsely identify Mr. Parish.

40.     Defendant Rezutko eventually obtained a false identification of Mr. Parish from Love.

41.     Shortly thereafter, Defendant Rezutko rushed to judgment and "solved" the case with respect to the second offender, the non-shooter, with uncanny speed by blocking any other possible suspects from view and manipulating

6

witnesses to make identifications that would confirm his false identification from Love.

42.     Within 48 hours, Defendant Rezutko prepared false witness statements for Ms. Canell and Mr. Kershner implicating Mr. Parish in the shooting.

43.     In those statements, Defendant Rezutko documented that both witnesses were "positive" that Mr. Parish was the non-shooter shorter assailant.

44.     In the process of manufacturing his case, Defendant Rezutko also used highly suggestive photo-arrays, where he included a juvenile photo of Mr. Parish and adult photographs of fillers.

45.     On October 31, 1996, Defendant Rezutko initiated charges against Mr. Parish for the attempted murder and armed-robbery of Mr. Kershner.  That same day, Mr. Parish was arrested.

46.     Importantly, Mr. Cooper and Mr. Parish did not know each other and had never met prior to being wrongfully convicted.

**Defendants Wrongfully Arrest Mr. Cooper for Purse-Snatching**

47.     On or about January 2, 1997, several months after the Kershner shooting and Mr. Parish's arrest, but before the police apprehended any alleged shooter, Mr. Cooper was headed home to his wife and children carrying several grocery bags when he stopped at a train crossing.

48.     While waiting for the train to pass, Mr. Cooper was not bothering anyone nor breaking any laws.

49.     Apparently, a woman had reported that a tall African-American attempted to snatch her purse earlier that day.

50.     Mr. Cooper was tall and African-American. Because of this, Officer McConnell of the Elkhart Police Department arrested him upon sight.

51.     Minutes later, officers from the Elkhart Police Department conducted a show-up with Mr. Cooper.

52.     In the process, Mr. Cooper was driven to the location of the victim and remained in the squad-car while the victim falsely identified him through the car window.   This show-up was unduly suggestive and belied any sense of reliability.

53.     Later that day, Defendant Ambrose took a statement from the victim which falsely implicated Mr. Cooper in the purse-snatching.

54.     Defendant Ambrose then interviewed Mr. Cooper, who steadfastly maintained his innocence.

55.     On January 6, 1997, Defendant Rezutko initiated false charges against Mr. Cooper for robbery based on the purse-snatching allegations.

**Defendant Rezutko's Threat to Frame Mr. Cooper**

56.     By January of 1997, several months passed without any leads on who the taller African-American suspect might be.

57.     After Mr. Cooper was arrested for purse-snatching, Defendant Rezutko developed a "hunch."

58.     According to Defendant Rezutko, Mr. Cooper became a suspect based on two things: (1) his "general description" and (2) his supposed similarity to a

composite sketch.  In his opinion, "Elkhart, Indiana doesn't have a whole lot of tall, six-foot…black male robbers running around….so that's probably …why I made the connection."

59.    As is shown below, the composite sketches from Ms. Canell and Mr. Kershner look dissimilar to each other and neither resemble Mr. Cooper.



Composite by Kershner                    Composite by Canell

60.    To corroborate his hunch, Defendant Rezutko went to see Mr. Cooper at the jail on or about January 3, 1997.

61.    There, Defendant Reuzkto threatened to frame Mr. Cooper for the robbery and attempted murder of Kershner unless he pleaded guilty to purse-snatching.  Specifically, Defendant Rezutko told Mr. Cooper that he was going to "sit on this egg," or words to that effect, if he did not plead guilty to the purse-snatching charges.  Then, Defendant Rezutko pulled out a newspaper article describing the shooting.

62.     Mr. Cooper responded by revealing to Defendant Rezutko that he had nothing to do with the crime and never met nor seen Mr. Kershner in his life.

63.     Because he was innocent of both crimes, Mr. Cooper refused to plead guilty.

64.     On March 6, 1997, Mr. Cooper was tried and found not-guilty of the false purse-snatching charges.

**Defendant Rezutko Follows Through on Threat to
Frame Mr. Cooper by Engaging in Eyewitness Identification Improprieties
That Violated Mr. Cooper's Due Process Right to a Fair Trial**

65.     On March 6, 1997, the same day of Cooper's acquittal on the false purse-snatching charges, Defendant Rezutko filed a probable cause affidavit and initiated charges against Mr. Cooper for the attempted murder and armed robbery of Michael Kershner.

66.     The contents of the affidavit and the initiation of charges were based upon evidence that was fabricated, manipulated, and improperly created by Defendant Rezutko and the other Defendant Officers.

67.     Defendant Rezutko began fulfilling his January 3, 1997 promise to frame Mr. Cooper by conducting unduly suggestive photo-arrays, threatening witnesses, and withholding exculpatory evidence learned during the identification process.

68.     According to Defendant Rezutko, the case he built against Mr. Cooper depended entirely on the witness identifications.

69.     On January 8, 1997, Defendant Rezutko met with Nona Canell and Michael Kershner regarding the shooting investigation.  According to the reports drafted by Defendant Rezutko, Ms. Canell and Mr. Kershner both identified Mr. Cooper's photograph in the photo arrays as the shooter and tall-offender that the police were searching for.  These arrays were unduly suggestive and belied any sense of reliability in that the fillers did not have similar characteristics to Mr. Cooper

70.     Three weeks later, on January 29, 1997, Defendant Rezutko asked to meet again with Ms. Canell and Mr. Kershner.

71.     At that meeting, Defendant Rezutko showed another photo-array to Ms. Canell and Mr. Kershner.

72.     According to Defendant Rezutko's reports, Ms. Canell and Mr. Kerhsner identified Mr. Cooper once again as the tall-man who shot Kershner and were "very sure" of their identifications.

73.     Defendant Rezutko's report memorializing the January 29, 1997 interviews with Ms. Canell and Mr. Kershner do not include an explanation for why he showed the witnesses photo-arrays of the alleged shooter when they both made a previous identification of Mr. Cooper three weeks earlier.

**The Eyewitnesses Recant Their Identifications of Mr. Cooper**

74.     Both Ms. Canell and Mr. Kershner have recanted their eyewitness identifications of Mr. Cooper that they made with Defendant Rezutko in January of 1997.

11

75.     Ms. Canell and Mr. Kershner's recantations are accompanied by allegations that Defendant Rezutko misrepresented, concealed, and distorted the true facts surrounding them.

76.     In 2008, Ms. Canell and Mr. Kershner revealed that they told Defendant Rezutko in January of 1997 that Mr. Cooper's photograph "looked like" the offender, not that he was the shooter.

77.     Additionally, Mr. Kershner told Defendant Rezutko that he "needed to see a lineup" because he "couldn't really identify anybody…"   In response, Defendant Rezutko pointed to Mr. Cooper's photograph and informed Mr. Kershner that this "is your guy."

78.     Ms. Canell, too, demanded a live line-up because she was unsure about whether Mr. Cooper was the right person. Defendant Rezutko responded to her concerns by stating that "we have the right guy and that there are not enough tall, skinny, black guys in Elkhart" to do a live line-up, or words to that effect.

79.     Instead of documenting that Ms. Canell and Mr. Kershner could not make an identification of anyone – including Mr. Cooper – and had doubts about who committed the crime, Defendant Rezutko fabricated false reports claiming that Ms. Canell and Mr. Kershner  were "very sure" of their identifications of Mr. Cooper.

80.     Frustrated with the process, Ms. Cannell and her son continued to demand a live line-up during her ensuing encounters with Defendant Rezutko.  And in response, Defendant Rezutko continued to deny their requests.

81.     Defendant Rezutko failed to document in any reports that Ms. Canell and Mr. Kershner had requested a live line-up and failed to make an identification.

82.     Instead, Defendant Rezutko's reports state that Ms. Canell and Mr. Kershner positively identified Keith Cooper in four separate photo-arrays during January of 1997.

83.     According to Defendant Rezutko's reports, these witnesses definitively identified Mr. Cooper without prompting.

84.     Significantly, none of this following information was disclosed to the prosecution or defense prior to Mr. Cooper's trial.

### Defendant Rezutko Coerces Eddie Love Into Falsely Implicating Mr. Cooper

85.     On January 8, 1997, Defendant Rezutko met with Eddie Love at the Elkhart County Detention Center.

86.     In that meeting, Defendant Rezutko obtained a statement from Mr. Love that implicated Mr. Cooper as the person who shot Mr. Kershner.

87.     By the conclusion of that meeting, Defendant Rezutko created a report which documented that Mr. Love "positively" identified Mr. Cooper as the shooter in a photo-array.

88.     After Mr. Cooper's wrongful conviction, Mr. Love revealed the circumstances of his false identification of Mr. Cooper.

89.     According to Love, Defendant Rezutko fabricated his January 8, 1997 report indicating that he was "positive" that Mr. Cooper was the tall individual who shot Mr. Kershner.

90.    At the time he drafted this report, Defendant Rezutko knew that the substance of it was false, and that Mr. Love maintained to him that he could not identify Mr. Cooper.

91.    Indeed, Defendant Rezutko's coercion and threats to Mr. Love were omitted from his report and never disclosed to the prosecution and defense prior to Mr. Cooper's trial.

92.    Defendant Rezutko threatened to charge Mr. Love with a drug arrest unless he acquiesced to his commands.  As a result of Defendant Rezutko's coercion, Mr. Love falsely identified Mr. Cooper in a photo-array.

93.    Mr. Love's statement was a work of fiction that derived from being "coerced" by Detective Rezukto.  According to Mr. Love, Detective Rezutko told him "this is what I want you - this is how it's going down," or words to that effect.

94.    Mr. Love also was afraid of the Elkhart Police Department and testified against Mr. Cooper to appease Defendant Rezutko.

95.    In sum, Love's statement and subsequent testimony against Mr. Cooper was  false and the result of Defendant Rezutko's coercion.

**Defendants Rezutko, Ambrose, and Windbigler Withhold Exculpatory Evidence and Fabricate False Statement for Jailhouse Informant**

96.    In 1996, Defendants Rezutko and Ambrose enlisted Debery Coleman as a confidential informant for the Elkhart Police Department.

97.    During the first week of February 1997, Mr. Coleman met with Defendant Rezutko at the Elkhart County Jail.  In that meeting, Defendant Rezutko informed Mr. Coleman that he was placing him into a cell with Mr. Cooper

14

for the sole purpose of eliciting information from him regarding the Kershner shooting.

98.    Defendant Rezutko was aware that Mr. Cooper was represented by counsel at the time he instructed Mr. Coleman to speak with Mr. Cooper.

99.    According to Mr. Coleman, Mr. Cooper maintained his innocence during the entire time they were incarcerated with one another.

100.    Nonetheless, on February 10, 1997, Defendant Windbigler met with Mr. Coleman and manufactured a false and fabricated statement for him.

101.    This fabricated statement for Mr. Coleman implicated Mr. Cooper in the armed robbery and attempted murder of Mr. Kershner.  Mr. Coleman's statement includes a detailed confession that Mr. Cooper supposedly gave to him about the shooting.

102.    Specifically, Coleman alleged that Cooper revealed that: (1) he wore a hat that was left at the scene and was worried about the police doing forensic testing on it; (2) Parish had been over his apartment earlier in the day, which is when they first discussed stealing drugs from Kershner; (3) Kershner brought marijuana to Parish, but Parish refused to pay for it; (4) a fight broke out resulting in Kershner being shot; (5) they ran back to Cooper's apartment after the shooting and eventually sold the drugs obtained from Kershner; (6) he used a .357 that he stored at his apartment; (7) he intended to flee to Florida after being bonded out.

103.   In an affidavit signed in 2009, Mr. Coleman revealed that his February 10, 1997 statement was completely fabricated by Defendant Windbigler and was only signed as a result of undisclosed promises of consideration.

104.   In Coleman's words, "Mr. Cooper's involvement in the event under this case was entirely fabricated … to gain favor with the Elkhart Drug Task Force for whom I was working as a confidential informant."

105.   In exchange for providing an incriminating statement against Mr. Cooper, Defendant Windbigler promised Coleman lenient treatment in his own case, consideration never before disclosed to the prosecution nor defense.

106.   In describing the promises made in exchange for his fabricated statement, Mr. Coleman explained in his 2008 affidavit that:

> Detective Windbigler helped me create a fabricated statement against Keith Cooper and Christopher Parish, details about the crime that I had no idea about.   Detective Windbigler gave to me for my statement.   I was promised things in exchange for my false statement and future testimony against Keith Cooper... Windbigler promised me that in exchange for my fabricated statement that he would get me a deal during my sentencing hearing.   He promised me that I would get suspended time and a much lesser sentence.   I was facing twenty years... He told me I would get a 10 year sentence with four years suspended.   I would only have to serve 6 years.   Of that 6, I would have to serve only 3 with good time.   Since I already had   served around   18   months, Detective Windbigler   was promising me about 18 more months of incarceration in exchange for lying against Keith Cooper.   .[3]

107.   Mr. Coleman also revealed that Defendant Windbigler told him that "he could not write down his promises to [him] because it was illegal, which is why he promised stuff orally," or words to that effect.

16

108.   At Mr. Cooper's criminal trial, Defendants Ambrose and Rezutko never disclosed that Mr. Coleman was a confidential informant for the Elkhart Police Department.

109.   Nor did Defendant Rezutko disclose that he placed Mr. Coleman into a cell with Mr. Cooper for the sole purpose of obtaining information.

110.   And of course, none of these Defendants disclosed that Mr. Coleman's statement was fabricated and manufactured in exchange for promises of consideration.

111.   However, the Defendants' misconduct did not end after manufacturing a false statement for a jailhouse informant.

**Defendant Rezutko Stages Show-up to Frame Mr. Cooper**

112.   In his on-going quest to frame Mr. Cooper, Defendant Rezutko staged a show-up on the first day of Mr. Cooper's trial as a result of the eyewitnesses' undisclosed reservations about committed the shooting.

113.   This, too, was never disclosed to Mr. Cooper nor the prosecution prior to Mr. Cooper's conviction.

114.   Ms. Canell and Mr. Kershner have revealed that Defendant Rezutko requested that they come to the first day of trial early and sit outside of the courtroom in a hallway.

115.   In a recent deposition, Ms. Canell described how Defendant Rezutko pointed Mr. Cooper out to her as he walked into the courtroom with his children.  As

Mr. Cooper walked past, Defendant Rezutko instructed Ms. Canell and the other eyewitnesses that this was the person who committed the crime.

116.    Defendant Rezutko told these witnesses to identify Mr. Cooper at trial.

117.    Because of these highly- improper and suggestive conditions, Ms. Canell and Mr. Kershner identified Mr. Cooper at trial as the person who robbed and shot at them.

118.    Mr. Cooper failed to learn the circumstances of the suggestive identification until more than a decade after the fact.

**Testimony that Caused Mr. Cooper's Wrongful Conviction**

119.    As a result of the Defendants' misconduct, Mr. Cooper was wrongfully convicted of armed-robbery and sentenced to 40 years in prison.

120.    At trial, the Defendants not only suborned perjury – e.g., telling witnesses to testify consistent with their false and fabricated identifications and statements – but also committed perjury themselves by lying about their conduct during the investigation, their role in procuring false statements, and about the reliability of various statements obtained in the investigation.

121.    Without the Defendants' misconduct, Mr. Cooper would not have been prosecuted or convicted.

122.    At trial, the State called three eyewitnesses who identified Mr. Cooper as the taller individual who shot Kershner on October 29, 1996.  Significantly, Ms. Canell, Mr. Kershner, and Mr. Love all identified Mr. Cooper at trial as being the taller offender who fired the gun.

123.    Mr. Coleman was also called by the State to testify to the supposed confession that Mr. Cooper made to him.  Mr. Coleman refused to testify and instead insisted on being held in contempt of court.

124.    The State then called Defendant Windbigler to testify to the substance of the written statement that he fabricated for Mr. Coleman on February 10, 1997.  At the conclusion of Defendant Windbigler's testimony, Coleman's statement was entered into evidence in its entirety.

125.    Importantly, Defendant Windbigler testified that he made no promises to Coleman at any point in time.  ("There's nothing I could do for him.").

126.    Mr. Cooper proclaimed his innocence and denied any involvement in the crime.  Mr. Cooper also rebuked any allegations that he confessed to Coleman.

127.    During Mr. Cooper's examination, the State requested that Jason Ackley be allowed into the courtroom in an effort to determine whether he could make a voice identification.  At the conclusion of his testimony, the State obtained a voice identification of Mr. Cooper from Ackley.

128.    On the basis of the aforementioned evidence, Mr. Cooper was convicted at trial of armed-robbery and sentenced to 40 years of imprisonment.

129.    There was never a shred of physical evidence developed against Mr. Cooper, nor did the investigators ever establish any connection to the victims or his co-defendant, or even any reason to suspect that Mr. Cooper had any reason to be engaged in that kind of activity.

130.    Mr. Ackley now admits that Defendant Rezutko took him outside during trial and instructed him to falsely identify Mr. Cooper's voice.

### DNA Evidence Illustrates Mr. Cooper's Innocence and Identifies True Culprits in Kershner Shooting

131.    As mentioned above, according to Kershner and the other eyewitnesses, the tall perpetrator got into a struggle with Kershner and lost his hat, a customized baseball cap with rhinestones on the front of it in the shape of the letter "J" on it.

132.    The 'J Hat' was collected from the crime-scene by Detective Joel Bourdon of the Elkhart City Police Department, who sent it in a sealed plastic bag along with an evidence collection kit from Mr. Cooper to the Indiana State Police.

133.    On June 17, 1997, the Indiana State Police sent the results of the DNA comparison test to the Elkhart Police Department.   From the tests, the lab analyst concluded that "the DNA isolated and amplified from the sweat band (Item 1b) of the hat (Item 1) revealed a mixture of alleles from which Keith Cooper can be eliminated as a possible contributor."

134.    However advances in DNA science after trial led to further testing on the hat in question.

135.    In this regard, on June 20, 2002, approximately five years after Mr. Cooper had been convicted, the Indiana State Police Laboratory once again compared the DNA sample found in the hat to Mr. Cooper.  This time, the DNA was further analyzed using newly-developed Polymerase Chain Reaction testing.  Based on this new technology, the lab technicians were able to identify a specific profile,

i.e., the DNA of a person whose identity was still unknown, but who was not Mr. Cooper.

136.    Mr. Cooper's attorney at the time, William Polansky from the Indiana Defender's office, immediately requested that the DNA taken from the hat be compared to those in the national DNA database, otherwise known as CODIS.

137.    On March 8, 2004, the Certificate of Analysis from the State Police Laboratory was mailed to the Elkhart Police Department.  According to the results, "The DNA profile obtained from one sample of the hat (item 1C) was searched in the National DNA Database and was found to be consistent with Michigan Department of Corrections Inmate Johlanis Cortez Ervin."

138.    Unlike Mr. Cooper, a family man with no criminal record, Mr. Ervin is currently serving a 60-year sentence in the Michigan Department of Corrections for second degree murder.

139.    That murder occurred on July 11, 2002, in the city of Benton Harbor, a town which is less than sixty miles away from Elkhart, Indiana.

140.    According to the Berrian County Police Reports, the weapon Ervin used in his Michigan crime is the same type of weapon which was used to shoot Kershner, a .357 magnum revolver.

141.    Even more telling, Johlanis Ervin's co-defendant in Michigan is his brother, Michael Ervin.  Michael Ervin happens to be a short and stocky African American who looks similar to Mr. Parish.

142.    During a re-investigation conducted by Mr. Cooper's post-conviction counsel, line-up photographs of both Ervin brothers were retrieved from the time frame when Kershner was shot.  Separately, these photographs were shown to the eyewitnesses who had been located.

143.    Upon being shown the various photographs, Ms. Canell identified the shooter as Johlanis Ervin and his brother as the second individual involved. According to Ms. Canell, "I misidentified Keith Cooper as the shooter of my son, Michael Kershner.  The individual who tried to kill my son is Johlanis Ervin,"

144.    When shown the photographs, Mr. Kershner also immediately identified Johlanis Ervin as the individual who tried to kill him in October of 1996. Mr. Kershner stated in his affidavit that "Johlanis Ervin was the individual who tried to kill me that night, not Mr. Cooper."

## Mr. Parish is Exonerated in 2005

145.    Based upon false and fabricated testimony, Mr. Parish was ultimately wrongfully convicted in June of 1998.

146.    As a result of Defendant Rezutko's misconduct, the eyewitnesses all identified Mr. Parish at trial.

147.    In 2005, the Indiana Court of Appeals vacated Mr. Parish's conviction and ordered a new trial.

148.    Shortly thereafter, the State of Indiana dismissed Mr. Parish's criminal case.

149.    Ms. Canell and Mr. Kershner both reject the claims made by Defendant Rezutko that they positively identified Mr. Parish and have since revealed the misconduct committed by the Defendants in this case.

### Mr. Cooper is Exonerated in 2017

150.    Never giving up hope and remaining steadfast in his protestation of innocence, Mr. Cooper filed a pardon petition based upon actual innocence to the Governor of Indiana in 2011.

151.    In February of 2014, the Indiana Pardon and Parole Board was presented with extensive evidence regarding Mr. Cooper's convicted for armed-robbery.

152.    At that hearing, the board was presented with testimony from Ms. Canell and Mr. Kershner, in addition to a number of other witnesses.

153.    Based on their thorough review of the evidence, the Indiana Pardon and Parole Board ultimately made a unanimous recommendation to the Governor of Indiana that Mr. Cooper be granted a pardon based upon his actual innocence.

154.    On February 9, 2017, Governor Holcomb exonerated Keith Cooper. Governor Holcomb did so because of his belief that Mr. Cooper was wrongfully convicted and deserved a pardon based upon his actual innocence.

155.    At a press conference where he announced the pardon, Governor Holcomb exclaimed, "[A]fter careful and thoughtful consideration and review, something that I've thought about every day over the last month, just earlier today I issued a pardon to Mr. Keith Cooper for his past and I believe wrongful armed

robbery felony…it's for all of these reasons, and personally believing that Mr.

Cooper has waited long enough and needs not endure any further uncertainty that I

issued this pardon this morning."

156.    The contents of Governor Holcombe's executive order includes the

following rationale: "(1) all of the eyewitnesses who identified Mr. Cooper at trial

have now recanted their testimony and said they were mistaken; (2) the jailhouse

informant has recanted his trial testimony; (3) the DNA evidence from the hat worn

by the robber at the crime scene now clearly identifies and points to another man

who is currently in prison for murder and who has subsequently been identified by

eyewitnesses as the actual person who shot the victim and committed the crime; (4)

the DNA testing confirmed that no DNA from Mr. Cooper was found on the hat."

**A Federal Jury Has Already Determined that Defendants Rezutko and the City of Elkhart Violated Mr. Parish's Constitutional Rights**

157.    On September 24, 2007, Mr. Parish filed a federal civil-rights action

against Defendants Rezutko, Ambrose, Cutler, and the City of Elkhart.  *See* Case

No. 07-cv-452 at Dkt. No. 1.

158.    In that suit, Mr. Parish alleged that the Defendants violated his

constitutional right to a fair trial and due process of law by fabricating evidence,

coercing witnesses, conducting photo-arrays that were improper and unduly

suggestive, and by withholding exculpatory evidence.

159.    Mr. Parish alleged that the Defendants engaged in such misconduct

pursuant to the policies, practices and customs wrongfully maintained by the

Defendant City of Elkhart.

160.    Mr. Parish was ultimately afforded a trial on his claims against Defendants City of Elkhart and Steve Rezutko.

161.    Mr. Parish presented three *Monell* theories before a jury in his federal civil trial: 1) that the policy maker, Chief Bechtel, turned a blind eye to misconduct and did nothing about it, thus allowing Defendant Rezutko to violate Mr. Parish's constitutional rights; (2) that the City of Elkhart failed to train it's employees, thus allowing an untrained Defendant Rezutko to violate Mr. Parish's constitutional rights; and (3) that the City of Elkhart had a custom and practice of withholding exculpatory information, thus causing the violation of Mr. Parish's constitutional rights.

162.    On October 27, 2010, a jury found in favor of Mr. Parish and against Defendant Steve Rezutko.  On Mr. Parish's policy and practice claim against Defendant City of Elkhart, the jury once again found in favor of Mr. Parish.

163.    The Seventh Circuit Court of Appeals affirmed the jury's liability determinations against Defendants Rezutko and the City of Elkhart on December 20, 2012.  *See Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir. 2012).

**The City of Elkhart Failed to Provide Sufficient Training and Supervision to Avoid Brady Violations and Has Exhibited Deliberate Indifference as to Whether or Not Brady Violations Will Continue to Occur**

164.    Just like Mr. Parish, the constitutional injuries Mr. Cooper suffered were caused by the policies and practices of the Elkhart Police Department.

165.    Indeed, within the Elkhart Police Department, there was a policy and practice of taking short cuts to solve criminal investigations, including by

fabricating statements, coercing witnesses and withholding exculpatory and impeachment evidence.

166.   Policymakers and supervisory personnel were aware of and failed to curb the improper investigative practices that led to the numerous *Brady* violations in this case.

167.   Importantly, Defendant Rezutko had been demoted within the Detective Bureau prior to the Kershner investigation, meaning that he was not permitted to work on homicide cases unless there were serious manpower shortages.

168.   According to Defendant Rezutko's former partner and supervisor, Larry Towns, the reason Detective Rezutko was removed from the investigation of homicide cases was due to his poor investigative work, his habit of rushing to judgment, his frequent manipulation of evidence, and his use of suggestive photo line-ups.

169.   Detective Rezutko's demotion, however, apparently did not preclude him from working on attempted homicides, such as the Kershner shooting. That is because Captain Towns did not have the authority to terminate Detective Rezutko's job altogether.

170.   Nevertheless, Towns did meet with Chief Bechthel about the problems with Rezutko's investigative practices. Chief Bechtel admitted to Towns that he wanted to fire Rezutko, but never actually did so.

171.   According to Mr. Towns's recent affidavit, it was widely known within the Elkhart Police Department, prior to the investigation into the Kershner

shooting, that Defendant Rezutko "often put together extremely suggestive line-ups in order to push the witness towards his preferred suspect instead of letting the witness make an independent decision." "For example, if a suspect was described as having a mustache, Rezutko would use a photo array that included the presumed suspect with a mustache and five other individuals without mustaches."

172.    Compounding the problem, supervising officers in the Elkhart Police Department were aware that when Defendant Rezutko performed photo line-ups, he would often make improper remarks, such as "How does #2 look to you?" thereby leading the witness in a suggestive manner.

173.    The problems that Defendant Rezutko had as an investigator, many of which were on full display during the Kershner investigation, were common knowledge at the Elkhart Police Department.  This includes the Department's most senior leadership.  Chief of Police Dennis Bechthel himself knew about Defendant Rezutko's misconduct, including his manipulation of witnesses and misuse of photo line-ups.

174.    Even Defendant Rezutko admits that near the end of his tenure, the Elkhart County Prosecutor's Office started refusing to issue arrest warrants and prosecute suspects in cases that he investigated.

175.    In this case, upon developing his "hunch" about Mr. Cooper, Defendant Rezutko prepared photo spread lineups containing six photos, one of which was Mr. Cooper's.  Somehow, Defendant Rezutko managed to have the victim and two other eyewitnesses pick out his suspect from a six-person photographic lineup.

176.    Considering that DNA evidence excludes Mr. Cooper, the odds of separate people independently picking out the wrong man's photograph would have to be a huge statistical improbability.   According to the newly discovered evidence – recantations from each of the witnesses in this case - random chance had nothing to do with their wrongful identifications of Keith Cooper at trial.

177.    This policy and practice repeated itself in numerous criminal investigations conducted by the Elkhart Police Department.  As Mr. Towns has testified, that misconduct was widespread.

178.    Nonetheless, and despite notice to (and often involvement of) policymakers in the above-described unconstitutional policies and practices, there was no effort to rectify any such misconduct.

179.    The City of Elkhart and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.

180.    They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

181.    The policies and practices described in the foregoing paragraphs were consciously approved by City of Elkhart policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

182.    Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

183.    Moreover, The City's failure to train its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case.

184.    Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

## Mr. Cooper's Damages

185.    Mr. Cooper spent over a decade in prison for a crime that he did not commit.  Upon his release, Mr. Cooper spent an additional eleven years of his life fighting his wrongful conviction.

186.    As such, Mr. Cooper was wrongfully convicted for a total of twenty years.

187.    During his wrongful incarceration, Mr. Cooper was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to raise his children, share holidays, births, funerals and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being

188.    As a result of his wrongful incarcerations, Plaintiff must now attempt to rebuild his life all without the benefit of a decade of life experience that ordinarily equip adults for that task.

189.    Plaintiff has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

**Count I - 42 U.S.C. § 1983**
**Due Process**

190.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

191.    As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Cooper of his constitutional right to a fair trial.

192.    In the manner described more fully above, the Defendants conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence.  Absent this misconduct, the prosecution of Mr. Cooper could not and would not have been pursued.

193.    The Defendants' misconduct also directly resulted in the unjust criminal conviction of Mr. Cooper, thereby denying each of his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

194.    As a result of this violation of his constitutional right to a fair trial, Mr. Cooper suffered injuries including but not limited to emotional distress and pain and suffering, as is more fully alleged above.

195.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Cooper's constitutional rights.

196.    The misconduct described in this Count was undertaken pursuant to routine practice of the Elkhart Police Department to pursue wrongful convictions through reckless and profoundly flawed investigations, provision of false evidence and reports, coerced evidence, and failure to properly supervise employees knowing that those employees were providing false evidence.  In this way, the municipal defendants violated Mr. Cooper's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

197.    These widespread practices, so well-settled as to constitute *de facto* policy in the Elkhart Police Department, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to these problems, thereby effectively ratifying them.

198.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count II – 42 U.S.C. § 1983
### Malicious Prosecution

199.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

200.    As described more fully above, the Defendants, individually, jointly and in conspiracy with each other, as well as under color of law and within the

31

scope of their employment, deprived Mr. Cooper of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

201.   In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Mr. Cooper for these crimes, for which prosecution there was no probable cause and which caused Mr. Cooper to suffer a deprivation of liberty.  Their misconduct included falsifying evidence and withholding exculpatory evidence.

202.   The Defendants' misconduct directly resulted in the unlawful prosecution and incarceration of Mr. Cooper, thereby denying each of his constitutional right to liberty in violation of his constitutional rights.

203.   As described more fully above, the prosecution was ultimately resolved in Mr. Cooper's favor.

204.   Because of this violation of his constitutional rights, Mr. Cooper suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

205.   The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Cooper's constitutional rights.

206.   The misconduct described in this Count was undertaken pursuant to a routine practice of the Elkhart Police Department to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Mr. Cooper's

32

rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

207.    These widespread practices, so well-settled so as to constitute *de facto* policy in the Elkhart Police Department, could exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

208.    The widespread practices described in the preceding paragraphs could flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count III – 42 U.S.C. § 1983
### Fourth and Fourteenth Amendments Fabrication of False Evidence

209.    Each paragraph of this Complaint is incorporated as if restated fully herein.

210.    In the manner described more fully above, the Defendants, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports and fabricated testimony offered at trial proceedings.  The Defendants knowingly fabricated this evidence. A reasonable likelihood exists that the false evidence affected the decision of the jurors and the courts that considered this false evidence.

211.    Defendants were acting under color of law and within their scope of employment when they took these actions.

212.    The Defendants' misconduct directly resulted in the unjust continued incarceration of Mr. Cooper, thereby denying each of his constitutional right to due

process as guaranteed by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for Mr. Cooper's continued detention, and the prosecution of the Plaintiff could not and would not have been pursued.

213.    As a direct and proximate result of the Defendant' actions, Mr. Cooper's constitutional rights were violated, and each suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IV – 42 U.S.C. § 1983
### Supervisory Liability

214.    Each paragraph of this Complaint is incorporated as if restated fully herein.

215.    The continued wrongful detention of Mr. Cooper was caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendant Cutler, when he failed to adequately train and supervise the individual Defendants.

216.    Specifically, the supervisory defendant was personally involved in the case against Mr. Cooper and knew or, in the absence of their deliberate indifference and recklessness, should have known of his subordinates' unconstitutional actions and related misconduct in the case.

217.    Furthermore, the supervisory Defendant failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those concerning the interviews of witnesses, the preparation of

forensic reports and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other Defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Cooper.

218.   These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the Defendant supervisor failed to train and supervise his subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Cooper's constitutional rights.

219.   The personal involvement of the Defendant supervisor, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Cooper, including the above-mentioned injuries and damages.

220.   The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Cooper's clearly established constitutional rights.

### Count V - 42 U.S.C. § 1983
### Failure to Intervene

221.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

222.   In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

223.   Because of the Defendant Officers' failure to intervene to prevent the violation of Mr. Cooper's constitutional rights, Mr. Cooper suffered pain and injury, as well as emotional distress.

224.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Cooper's rights.

225.   The misconduct described in this Count was undertaken pursuant to the policy and practice of the Elkhart Police Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the Municipal Defendants with final policymaking authority.

### Count VI - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

226.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

227.   After Kershner was shot, the Defendants reached an agreement amongst themselves to frame Mr. Cooper for the crime and to thereby deprive him of his constitutional rights and liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

228.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

229.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

230.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Cooper's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

231.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

232.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Elkhart Police Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

### Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant City of Elkhart

233.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

234.    The actions of the Elkhart Police Officers in withholding material exculpatory information from Mr. Cooper and his counsel were undertaken pursuant to the policies and practices of the Elkhart City Police, described above,

which were created, maintained, or ratified by policymakers for the City of Elkhart with final policymaking authority.

235.    The policies and practices described in this Count were maintained and implemented by the City of Elkhart with deliberate indifference to Mr. Cooper's constitutional rights.

236.    As a direct and proximate result of the City of Elkhart's actions, Mr. Cooper's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

237.    The City of Elkhart is therefore liable for the misconduct committed by its officers.

## STATE LAW CLAIMS

### Count VIII
### Negligent Supervision

238.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

239.    The Municipal Defendants, as well as supervisory Defendant Cutler, had a duty to properly train and supervise officers, detectives, and supervisor employees of the City of Elkhart Police Department and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

240.    The Municipal Defendants and the supervisory Defendant were grossly negligent and negligent in the training, supervision and discipline of the Defendant

Officers, resulting in Mr. Cooper being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

241.    Because of this misconduct, Mr. Cooper suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

## Count IX
## Respondeat Superior

242.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

243.    In committing the acts alleged in the preceding paragraphs, the Defendants were members and agents of the Elkhart Police Department, acting at all relevant times within the scope of their employment.

244.    Defendants City of Elkhart are liable as principals for all state law torts committed by their agents.

## COUNT X
## Intentional Infliction of Emotional Distress

245.    Mr. Cooper hereby incorporate by reference the foregoing paragraphs and further allege as follows.

246.    Defendants intentionally and/or recklessly, directly and proximately caused Mr. Cooper, innocent men, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Cooper to refrain from a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally

adequate investigation, and e) maliciously prosecuting Mr. Cooper and causing his false arrest and imprisonment.

247.   The Defendants' actions caused Mr. Cooper to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

248.   The Defendants' actions caused Mr. Cooper to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

## Count XI
## Negligent Infliction of Emotional Distress

249.   Mr. Cooper hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

250.   Defendants, directly, proximately, and with negligence and/or gross negligence, caused Mr. Cooper, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Cooper to refrain from a) compelling him to be a witness against himself, b) destroying evidence, c) fabricating evidence, d) withholding material, exculpatory and impeachment evidence, e) failing to conduct a constitutionally adequate investigation, and f) maliciously prosecuting Mr. Cooper and causing his false arrest

40

and imprisonment, directly and proximately caused Mr. Cooper to be falsely arrested, maliciously prosecuted, and wrongly imprisoned.

251.   The Defendants' actions caused Mr. Cooper to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

252.   The Defendants' actions caused Mr. Cooper to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.


**WHEREFORE**, Plaintiff KEITH COOPER, respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF ELKHART, STEVE REZUTKO, EDWARD WINDBIGLER, STEVEN AMBROSE, and TOM CUTLER awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## **JURY DEMAND**

Plaintiff, KEITH COOPER, hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

/s/ Elliot Slosar
*One of Plaintiff's Attorneys*


Arthur Loevy
Jon Loevy
Michael Kanovitz
Gayle Horn
Heather Lewis-Donnell
Elliot Slosar* (*Pro Hac Vice Motion Forthcoming*)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902