UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KEITH COOPER,                    )
                                 )
            Plaintiff,           )
                                 )
      v.                         )          Case No. 3:17-cv-834-PPS-MGG
                                 )
CITY OF ELKHART,                 )
STEVE REZUTKO, EDWARD            )
WINDBIGLER, STEVEN AMBROSE,      )
and TOM CUTLER,                  )
                                 )
            Defendants.          )

## OPINION AND ORDER

This lawsuit is the latest chapter in a long running story involving Keith Cooper,

a man who was convicted of armed robbery, sentenced to 40 years in prison, and served

more than eight years before his conviction was called into question, and he was

released. Cooper's prison sentence was cut short because of the granting of a motion for

immediate release from an Indiana state court judge in 2006. But Cooper maintained

that he was more than just an innocent man convicted of a crime he did not commit,

and that is where the case before me comes in. Cooper alleges that his arrest,

prosecution and conviction were the result of intentional wrongdoing, including the

manufacturing and fabrication of false evidence by the defendants. This wrongdoing he

says, amounted to a violation of his civil rights.

Cooper has sued the City of Elkhart, as well as individual police officers Steve

Rezutko, Edward Windbigler, Steven Ambrose and Tom Cutler (who I'll refer to by

their last names or collectively as the "individual defendants") under state and federal law seeking redress for violation of his civil rights. One might reasonably wonder why Cooper waited nearly eleven years from his release from prison to bring this lawsuit. Indeed, that is the issue that is principally before me on the present motion for judgment on the pleadings.

Here's why: on February 19, 2017, almost eleven years from his release from prison, Cooper secured a pardon from Indiana Governor Eric J. Holcomb. The effect of this pardon on the timeliness of this lawsuit is the issue that is presently before me. The defendants have filed a Motion for Judgment on the Pleadings [DE 45] arguing primarily that I am unable to reach the merits of Cooper's claims because his lawsuit is barred by the statute of limitations. But because I find the legal reasoning behind defendants' argument to be unpersuasive and contrary to Supreme Court precedent, I will deny the majority of what their motion seeks.

### Background

Cooper alleges he was the victim of a coordinated effort to convict him of a crime he had nothing to do with. In his complaint, he tells a story of rogue police officers who were so overzealous in their pursuit of someone to convict that they improperly coerced witnesses to fabricate incriminating evidence and concealed exculpatory evidence not just from Cooper, but from prosecutors who would later try Cooper. It is a harrowing and deeply troubling story, that if true, shows disturbing intentional misconduct on the part of the Elkhart Police Department. Given this is a motion for judgment on the

pleadings, I must take all of plaintiff's well-pled allegations as true, and so the following summary of comes from Cooper's complaint.

**A. The 1996 Robbery and Shooting of Michael Kershner.**

On the night of October 29, 1996, Michael Kershner was shot and robbed inside his family's home in Elkhart, Indiana. [Compl., DE 1 at ¶ 19.] Here's what happened: while he was watching a movie with members of his family and friends, Kershner heard a knock on the door, and when he opened it, he was greeted by two African-American men, one short and one tall. The men were armed and forced themselves into the apartment. They demanded money and drugs. Kershner reached for his own gun, and a scuffle ensued during which Kershner was shot in the hip by the taller of the two robbers. The assailants soon fled, taking a bag of quarters (the home's laundry money) and two weapons. But during the altercation, the taller intruder (who shot Mr. Kershner in the hip) lost his baseball cap and left it behind. And it wasn't just any standard Cubs or White Sox cap, but a customized leather cap, embroidered on the front with the letter "J" in rhinestones. [*Id.* at ¶¶ 21-24, 131.] Kershner was transported to a nearby hospital and thankfully, survived his injuries. [*Id.* ¶¶ 25-26.]

**B. The Elkhart Police Department Investigates the Shooting.**

Steve Rezutko was the Elkhart police officer assigned to lead the investigation into the shooting and armed robbery. [DE 1 at ¶ 27.] As part of the investigation, defendant Windbigler (and later defendant Rezutko) interviewed a man named Eddie Love, who was in the apartment and witnessed the shooting. During the interviews,

Love described the two individuals he witnessed enter the apartment but denied knowing who they were or their names. When describing the shorter individual, Love told the police that the suspect bore a resemblance to a man he knew who lived in Elkhart named Christopher Parish. Apparently, Love was adamant that the intruder was not Parish, only that he bore a resemblance to Parish, but Rezutko "coerced and put substantial pressure on Mr. Love to falsely identify Mr. Parish," eventually obtaining statement from Love falsely identifying Parish as the non-shooter intruder. [*Id.* at ¶ 33-41.]

Cooper alleges that the coercion of Love included highly-suggestive and biased photo arrays to secure a false identification. Using similar tactics, Rezutko also prepared a false witness statement for Nona Canell, Kershner's mother. In that statement, like the one given by Love, Canell stated she was "positive" that Parish was one of the intruders. [*Id.* at ¶¶ 42-45.] The Canell statement was a pack of lies conjured up by Rezutko. But if did the trick because two days later, on October 31, Parish was arrested. [*Id.* at ¶ 45.] Parish's arrest still left the identity of the alleged shooter himself, then known only to police as a "tall African-American man."

On January 2, 1997, a little over two months after the shooting and Parish's arrest, plaintiff Keith Cooper was arrested for a crime wholly unrelated to Kershner's shooting. The circumstances of his arrest as he tells it are extremely troubling in and of themselves. On that day, Cooper was waiting at a train crossing holding several grocery bags while walking home. While he was waiting at the crossing, seemingly minding his

own business, he was seen by an Officer McConnell of the Elkhart Police Department who arrested Cooper on sight because he was a tall African-American man and earlier that day a woman reported a tall African-American man had snatched her purse. [*Id.* at ¶¶ 47-50.] Cooper was placed in a squad car and driven to the purse-snatching victim for a show up identification. The victim apparently identified Cooper through the car window. He was later charged, but he maintained his innocence throughout. [*Id.* at ¶¶ 52-55.]

Even though months had passed and there was no real connection between the crimes, very soon after Cooper's arrest, Rezutko developed a "hunch" that Cooper was Kershner's shooter based upon his "general description" and supposed similarity to composite sketches done based on Kershner and his mother's descriptions. [*Id.* at ¶¶ 56-59.] In justifying his hunch that Cooper was the other person involved in the robbery and shooting of Kershner, Rezutko later made the preposterous statement that "Elkhart, Indiana doesn't have a whole lot of tall six-foot ... black male robbers running around . . . so that's probably . . . why I made the connection." [*Id.* at ¶ 58.] According to Cooper, however, Rezutko's reasoning wasn't even that innocent. Far from it. Instead, Cooper tells me that on January 3, Rezutko visited the jail and threatened to frame Cooper for the robbery and attempted murder of Kershner unless he pleaded guilty to the purse-snatching charges. Rezutko took out a newspaper article describing the robbery and shooting to Cooper and told him that he was going to "sit on this egg" unless he pleaded guilty to purse snatching. [*Id.* at ¶ 61.] Cooper refused.

From there, Rezutko began building his case, apparently not in the hopes of finding the actual perpetrator, but instead pinning crimes on Cooper. He did so by using "unduly suggestive" photo lineups featuring "fillers" who bore no resemblance to Mr. Cooper. With these tactics, he was able to draft statements in which Canell and Kershner identified Cooper's photograph as being the shooter and were "very sure" of the identification. [*Id.* at ¶¶ 67-73.] Rezutko was even more coercive with other witnesses. On January 8, 1997, Rezutko met with Eddie Love (the eyewitness to the shooting), at the Elkhart County Detention Center and threatened to charge Love "with a drug arrest unless he acquiesced to his commands." [*Id.* at ¶ 92.] Although Love later recanted, at the time he acceded to Rezutko's demands and provided a statement falsely identifying Cooper as the shooter and then later, testified against Cooper at trial.

Rezutko's next tactic was to enlist the assistance of the Elkhart Police Department's resident jailhouse snitch, Debery Coleman. Coleman had previously been enlisted by the Elkhart Police Department to work as a confidential information, and in February 1997, Rezutko informed Coleman he was going to be placed in a cell with Cooper "for the sole purpose of eliciting information from him regarding the Kershner shooting." [*Id.* at ¶ 97.] Rezutko knew that Cooper was represented by counsel, but Coleman was nonetheless instructed to elicit information from Cooper after the two were housed together. Coleman has stated that Cooper maintained his innocence when they two spoke, but that nonetheless, on February 10, 1997, defendant Windbigler met with Coleman and the two manufactured a statement implicating Cooper in the armed

robbery and attempted murder. [*Id.* at ¶ 101.] This included a detailed confession that Cooper supposedly made which contained numerous fabricated details. Coleman later stated in sworn testimony that he went along with Windbigler because Windbigler had made promises of leniency for Coleman with regard to his own drug sentence, if he helped the Elkhart Police Department frame Cooper. [*Id.* at ¶¶ 104-107.]

On March 6, 1997, Cooper was tried and acquitted of the purse-snatching charges. [*Id.* at ¶ 65.] That same day, Rezutko filed a probable cause affidavit and charges were initiated for the attempted murder and armed robbery of Michael Kershner based upon the allegedly fabricated evidence Rezutko had been securing through improper means and intimidation in the weeks before. [*Id.*]

**C. Cooper is Tried and Sentenced to Forty Years in Prison.**

At trial, it is alleged that the defendants' misconduct continued. Cooper tells me that defendants suborned perjury from four witnesses and themselves committed perjury when they testified at trial. This included the three eyewitnesses to the shooting – Ms. Canell, Mr. Kershner, and Mr. Love – all of whom identified Cooper as the "tall shooter" from the night in question. Likewise, while Coleman (the jailhouse informant) had provided a statement to police that Cooper had confessed to him in their cell, Coleman refused to testify and was held in contempt of court. But Coleman's statement to police nonetheless came into evidence after it was introduced during the examination of defendant Windbigler who testified to its substance. Finally, Jason Ackley, identified Cooper during his testimony by his voice, a statement which he later recanted and has

stated that was done only at the instruction of Rezutko. It was upon this supposed eyewitness testimony and testimony from police that Cooper was convicted. Cooper's co-defendant Parish, was likewise convicted of the robbery. During the trial, no physical evidence linking Cooper to the crime was introduced. [DE 1 at ¶¶ 119-129.]

### D. A Reversal of Fortune for Cooper and Parish.

Approximately five years after a jury convicted Mr. Cooper, further DNA testing was conducted on the hat left behind by the assailants at the scene of the robbery. In 1997, more rudimentary DNA testing had concluded that "the DNA isolated and amplified from the sweat band (Item 1b) of the hat (Item 1) revealed a mixture of alleles from which Keith Cooper can be eliminated as a possible contributor." [DE 1 at ¶ 133.] But, shockingly, it seems those conclusions were never shared with Cooper or his defense. And then, five years later, the evidence became even more unequivocal. Based on new available technology, DNA testing was able to identify a specific profile of an individual and confirm it was not Cooper's hat.

At some point the new DNA profile was compared to the national database and provided a match: one Johlanis Cortez Ervin, who was currently serving a 60-year sentence in Michigan for second degree murder. [*Id.* at ¶¶ 133-140.] That murder took place in Benton Harbor, Michigan, a town less than sixty miles from Elkhart. What's more, the gun used in that murder was the same type which shot Kershner. Shortly thereafter, Canel and Kershner, both of whom had previously identified Cooper as the shooter, recanted and after reviewing photo lineups, identified Ervin as the man who

robbed and shot Kershner on October 29, 1996. [*Id.* at ¶¶ 142-44.]

In December 2005, the Indiana Court of Appeals granted Parish's petition for post-conviction relief based on ineffective assistance of counsel. The state declined to try Parish again and the charges against him were dismissed. As for Cooper, he had filed a similar petition for post-conviction relief, as well as a motion to modify his sentence. In April 2006, his motion to modify his sentence was granted (he was released, without parole or probation) based on time served and accordingly withdrew his petition for post-conviction relief. [*See* DE 46-7 and DE 46-8.]

**E. Cooper Obtains a Pardon from the Governor of Indiana.**

But despite having decided to leave prison with his conviction intact, Cooper maintained his innocence of the crimes for which he had been convicted. As such, he petitioned for a pardon from the Governor of Indiana in 2011 [DE 1 at ¶ 150.] In Indiana, although not mandated by law, it appears that it is common for governors to require a 5-year waiting period and evidence of rehabilitation as a prerequisite to any pardon. *See* Restoration of Rights Project, "Indiana Restoration of Rights, Pardon, Expungement & Sealing" *available at* https://ccresourcecenter.org/state-restoration-profiles/indiana-restoration-of-rights-pardon-expungement-sealing (accessed January 28, 2019).

In 2014, the Indiana Pardon and Parole Board held a hearing in which Canell, Kershner and other witnesses testified to how they had falsely identified Cooper as the shooter, in addition to other evidence indicating his innocence. [DE 1 at ¶¶ 151-152.]

The Indiana Pardon and Parole Board then made a unanimous recommendation to the Governor of Indiana that Cooper receive a pardon for his armed robbery conviction. For reasons that are unclear from the complaint, the pardon recommendation remained unacted on by then-Governor Mike Pence for several years.

Cooper's fortunes changed with the election of Eric Holcomb as Indiana's new Governor. On February 9, 2017, Governor Holcomb granted Cooper a pardon. The executive order granting the pardon stated the bases for the Governor's decision including the fact that "(1) all of the eyewitnesses who identified Mr. Cooper at trial have now recanted their testimony and said they were mistaken; (2) the jailhouse informant has recanted his trial testimony; (3) the DNA evidence from the hat worn by the robber at the crime now clearly identifies and points to another man who is currently in prison for murder and who has subsequently been identified by eyewitnesses as the actual person who shot the victim and committed the crime; [and] (4) the DNA testing confirmed that no DNA from Mr. Cooper was found on the hat." [*Id.* at ¶ 156.] This lawsuit followed shortly thereafter.

## Discussion

### A. Legal Standard

"A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014) (citing *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 633 (7th Cir. 2007)). To

survive defendants' motion, Cooper's complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

"Although the statute of limitations is ordinarily an affirmative defense that must be pleaded under Fed. R. Civ. P. 8(c), a district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred." *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) (citations omitted). "Taking judicial notice of matters of public record" for purposes of determining whether the statute of limitations has run on a claim "need not convert a motion to dismiss into a motion for summary judgment." *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012). "A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned." *Ennegna*, 677 F.3d at 773-74 (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir. 1997)). For example, a court may take judicial notice of "dates on which certain actions were taken or were required to be taken in the earlier state-court litigation—facts readily ascertainable from the public court record and not subject to reasonable dispute. *Id.* at 774 (citing *Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir. 1994)).

### B. The Statute of Limitations Issue

Cooper has alleged seven counts of violations of 42 U.S.C. § 1983, divided into categories based on the constitutional rights allegedly violated. Specifically, Cooper claims that defendants' conduct constituted (1) a denial of due process, (2) malicious prosecution; (3) violations of the Fourth and Fourteenth Amendments for fabricating false evidence; (4) a claim for supervisory liability for certain defendants; (5) a failure to intervene; (6) a conspiracy to deprive Cooper of his constitutional rights; and (7) a claim against Elkhart for a practice and policy which led to the aforementioned civil rights violations (*i.e.* a *Monell* claim). These Section 1983 claims will be addressed together for purposes of statute of limitations and separately to the extent necessary.

This brings me to the primary argument advanced by defendants here: that Cooper waited too long to file his lawsuit. They argue that Cooper's claims are barred by the statute of limitations as a matter of law. Before addressing the issue, I need to discuss the fundamentals of statute of limitations law in the context of these claims. "Section 1983 does not contain an express statute of limitations, so federal courts adopt the forum state's statute of limitations for personal injury claims." *Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001) (citation omitted). In Indiana, the statute of limitations for personal injury claims (including malicious prosecution) is two years. Ind. Code. § 34-11-2-4(a); *Commercial Credit Corp. v. Ensley*, 264 N.E.2d 80, 85 (Ind. App. 1970).

But there is an added wrinkle here; the Supreme Court's ruling in *Heck v. Humphrey*, 512 U.S. 477 (1993). In *Heck*, the Court ruled that if a Section 1983 claim

would necessarily impair or impugn the validity of an underlying criminal conviction, the action cannot be brought (and thus does not accrue) until the underlying conviction has been invalided by other means. This was based on "the hoary principle that civil tort actions" which seek monetary damages "are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Heck*, 512 U.S. at 486. Specifically, the Court said that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been ***reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus***[.]

*Id.* at 486-87 (emphasis added).

So here, the question is: *when* was Cooper's conviction invalidated, if at all? Defendants argue that Cooper's claims accrued on April 27, 2006, when a state court granted him a motion for immediate release from prison. Cooper's rejoinder is that while he walked free in 2006, he was released with a wholly intact criminal conviction for armed robbery. Thus, he says his claim did not accrue until nearly eleven years later when he obtained a pardon from the Governor on February 9, 2017. Defendants reply to that is that even if that were so, the February 9, 2017 pardon was insufficient as a matter of law to truly invalidate Cooper's sentence. Thus, if the claims are not barred by the statute of limitations, then instead Cooper's claims are barred by *Heck* because this is a

Section 1983 damages action which seeks to invalidate an intact conviction. Each of these arguments and issues will be addressed in turn.

The question as to whether Cooper's claim accrued in 2006 is easily answered based upon *Heck* as well as a very recent decision from the Seventh Circuit in a factually analogous case. In *Savory v. Cannon*, the Seventh Circuit reversed a district court's dismissal of a malicious prosecution Section 1983 lawsuit on statute of limitations grounds. -- F.3d --, 2019 WL 116807 (7th Cir. Jan. 7, 2019). At issue in *Savory* was whether the accrual date was December 6, 2011, when Savory's parole was terminated, or January 12, 2015, when he received a pardon from the Governor of Illinois. *Id.* at *4-5. Following the clear language of *Heck*, quoted above, *Savory* makes clear that a claim does not accrue merely upon release from prison or termination of parole so long as the conviction itself remains intact. Instead, the conviction stands until a pardon is granted. *Id.* at *7.

Based upon the holding of *Heck* and as applied by the Seventh Circuit, it is plain that Cooper's claim is not barred by the statute of limitations. Cooper's claim accrued on February 7, 2017, when Governor Holcomb issued his pardon, not when he was granted immediate release (conviction intact) in 2006. Because this suit was filed within the two year statute of limitations, the suit is timely.

This brings me to the second argument offered by defendants: that the February 2017 pardon by the Indiana Governor was insufficient as a matter of law to be considered a pardon removing *Heck*'s bar. In effect, defendants argue this wasn't a "real

-14-

pardon" or one based on "actual innocence." The argument is weak. Under the Indiana Constitution, "The Governor may grant reprieves, commutations, and pardons, after conviction, for all offenses except treason and cases of impeachment, subject to such regulations as may be provided by law...." Ind. Const. Art. V, Section 17. Governor Holcomb's pardon was plainly based upon the fact Cooper was not actually guilty of the crime he was convicted of. Again, the executive order said it was based on the fact that: "(1) all of the eyewitnesses who identified Mr. Cooper at trial have now recanted their testimony and said they were mistaken; (2) the jailhouse informant has recanted his trial testimony; (3) the DNA evidence from the hat worn by the robber at the crime now clearly identifies and points to another man who is currently in prison for murder and who has subsequently been identified by eyewitnesses as the actual person who shot the victim and committed the crime; [and] (4) the DNA testing confirmed that no DNA from Mr. Cooper was found on the hat." [DE 1 at ¶ 156.] If that's not a statement of innocence, I'm not sure what is. Furthermore, defendants do not point to any regulations provided by law which otherwise limits the scope of the pardon in question.

And even if the text of the order itself never said "actual innocence" it is unclear why that matters. Indeed, defendants offer very little in terms of *why* such "magic words" would be necessary or why their absence means as a matter of law that Cooper has failed to state a claim. Instead, both parties agree that *Blake v. State*, 860 N.E.2d 625 (Ind. App. Ct. 2007) holds that to determine the scope of a pardon a court looks to the language to determine the Governor's intent. Here, "[t]here is nothing in the pardon to

suggest there were conditions attached to this grant of executive clemency." *State v. Bergman*, 558 N.E.2d 1111, 1114 (Ind. Ct. App. 1990). To me, and especially at the pleadings stage, it seems clear that the intent of the pardon was to remove Cooper's conviction based upon all of the evidence which had come forth to show his innocence of the crimes he was convicted of.

Finally, defendants' citation to cases based on Illinois law (in which there are distinct "general pardons" and "pardons based on actual innocence," *see generally Walden v. City of Chicago*, 391 F. Supp. 2d 660, 671 (N.D. Ill. 2005)) seems misplaced, as that is not the law in Indiana. Nearly 90 years ago, the Indiana Supreme Court stated that:

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction, from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

*Kelley v. State*, 185 N.E. 453, 458 (Ind. 1933) (quoting *Ex parte Garland*, 4 Wall. 333, 380, 18 L. Ed. 366 (1866)). Accordingly, I find that Governor Holcomb's pardon sufficiently removed *Heck*'s bar from suit in this case.[1]

---

[1] Because *Heck*, *Savory* and Indiana case law on pardons all show that Cooper's claim has accrued and is not barred by the statute of limitations, I find the issue of judicial estoppel unnecessary to resolve the issue and thus need not address the parties' numerous arguments on this point.

Despite my finding that the statute of limitations does not bar this action, it is reasonable to question why this whole sordid affair has lingered for so long. Recall that the alleged crime took place in 1996, and Cooper was released from prison a decade later.  Cooper opted for immediate release from prison as opposed to fighting the matter and seeking a dismissal of the charges against him or going to trial and hoping for an acquittal. He took the bird in the hand. Parish, by contrast, upon his case being reversed by the Indiana Appellate Court, chose to fight. He refused a plea offer and eventually the state backed down and his charges were dismissed. He then timely filed a lawsuit, and his case went to trial in front of Judge Lozano in 2010. *See Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir. 2012).

Yet for reasons that appear to be based on an informal policy of the Governor to not consider pardon requests made sooner than five years from release from prison, Cooper did nothing for five years to redress the injustice that was brought upon him. *See* Restoration of Rights Project, "Indiana Restoration of Rights, Pardon, Expungement & Sealing" *available at* https://ccresourcecenter.org/state-restoration-profiles/indiana-restoration-of-rights-pardon-expungement-sealing (accessed January 28, 2019). With memories fading fast, I have my doubts over whether any of this makes sense. It seems to me that it would be more sensible to require people in Cooper's shoes to bring their pardon request within two years of being released from a criminal justice sentence (whether it be imprisonment or parole) and then allow the statute of limitations to toll while the pardon request is pending. But this is neither here nor there.  As a district

judge in a hierarchical system of courts, my obligation is to follow the commands of my superiors. And as discussed above, the law is clear that Cooper was within his rights to take the tack that he did, and in doing so he has overcome the statute of limitations defense.

### C. Cooper's Claims Based on False Arrest

Defendants have moved for judgment on the pleadings, also based on the statute of limitations, for any claims by Cooper based on his false arrest. [*See* DE 46 at 18-19.] Cooper responds, however, that he has not filed suit for false arrest or false imprisonment and thus defendants' motion is "moot." [DE 59-2 at 33.] I will take Cooper at his word that references to wrongful arrests are but factual allegations and not claims for state law torts of false arrest or false imprisonment. Accordingly, defendants' motion for judgment on the pleadings on these "claims" is denied as moot.

### D. Defendants Claim of Immunity for the Alleged False Testimony

Defendants have moved for judgment on the pleadings for Cooper's Section 1983 claims premised on their allegedly false testimony at Cooper's original criminal trial. "When a police officer appears as a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth-in which event he can make a strong claim to witness immunity; alternatively, he may be regarded as an official performing a critical role in the judicial process, in which event he may seek the benefit afforded to other governmental participants in the same proceeding." *Briscoe v. LaHue*, 460 U.S. 325, 335–36 (1983). The "benefit" being referred to in *Briscoe* is of absolute immunity from

tort damages. *Id.*

Cooper responds that the defendants have again misconstrued the claims he has brought. He tells me that "[s]imply put, Defendants Rzutko, Windbigler, and Ambrose are not being sued for testifying at trial, but rather, for the serious misconduct they committed during the underlying investigation." [DE 59-2 at 32-33.] Again, I will take Cooper at his word (and he will be bound by) his statements that he is not pursing a claim based on defendants' trial testimony. To the extent, Cooper is seeking damages or a claim based on defendants' trial testimony, such a claim cannot proceed because defendants would be entitled to absolute immunity for the substance of their testimony at trial. *Briscoe*, 460 U.S. at 335-36. But because there is no independent Section 1983 claim for false trial testimony, and defendants have not moved or laid out a basis to strike such factual allegations from Cooper's complaint, I will deny this portion of defendants' motion for judgment on the pleadings as well.

**E. The *Monell* Claim**

In addition to the individual defendants sued herein, Cooper has also filed suit against the City of Elkhart. The Supreme Court has held that "a municipality cannot be held liable under §1983 on a *respondeat superior* theory" but that doesn't mean such municipalities are immune from liability for constitutional violations. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978). Instead, municipalities may be held liable via Section 1983 under so-called *Monell* claims when a municipality has an express policy or unwritten custom which violates an individual's civil rights under

color of state law. *Id.* at 690.

In order to sufficiently state a *Monell* claim against a local governing body, a plaintiff must allege a constitutional harm caused by (1) an official policy promulgated by the body's officers; (2) a practice or custom, though not official, is widespread; or (3) a policy approved of or adopted by an official with final policy-making authority as to the governmental body. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). At the pleading stage, the burden placed on a plaintiff to state such a claim is not particularly burdensome. *Miller v. City of Plymouth*, 2010 WL 1474205, at *6 (N.D. Ind. Apr. 9, 2010) ("In the context of section 1983 municipal liability, district courts in the Seventh Circuit post *Twombly* and *Iqbal*, have continued to apply *Leatherman's* holding that plaintiffs are not held to a heightened pleading requirement nor are they required to plead specific facts to prove the existence of a municipal policy."); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) (rejecting any notion of a "heightened pleading standard" in civil rights cases alleged municipal liability under Section 1983).

Cooper has satisfied that standard by alleging that the City of Elkhart had a widespread policy and/or custom of coercing witnesses, fabricating evidence and concocting false eye witness identifications to frame otherwise innocent criminal defendants. To support this allegation, Cooper points to specific facts relating to the investigation and prosecution of Cooper himself, but also that of his Parish who was allegedly railroaded and harmed in a similar fashion. Cooper likewise alleges that the

senior policy makers within the Elkhart Police Department were aware of these practices but failed to take sufficient steps to curb or correct them. These are more than mere boilerplate or conclusory allegations, and that is enough for this claim to survive the City of Elkhart's motion for judgment on the pleadings as to the *Monell* claim. The proof, of course, is in the pudding. Whether Cooper will be able to marshal enough evidence to link the City of Elkhart into this case under *Monell* will be an issue to be decided later, but for now it is enough to say that he has met the pleading standard and the case must proceed to discovery on the issue.

### F.  Plaintiffs' Supplemental State Law Claims

In addition to the Section 1983 federal law claims, Cooper has also included four state law counts in his complaint. Those include a claim for negligent supervision against defendant Cutler and other supervisors (Count VIII), a respondeat superior liability claim against the City of Elkhart for the same conduct (Count IX), and an intentional infliction of emotional distress (Count X) and negligent infliction of emotional distress (Count XI) claims against the individual defendants. Defendants tell me those claims are barred by the Indiana Tort Claims Act's notice requirement, its immunity provisions for public officials, as well as the statute of limitations.

As for the emotional distress claims (Counts X and XI), Cooper concedes under these circumstances there can be no liability under Indiana law and has moved to voluntarily dismiss them in his response brief. [DE 68 at 38, n.10.] Accordingly, those claims will be dismissed.

As for the other state law claims, unfortunately, the parties' briefing on these claims is not a model of clarity and they seem to talk past one another when discussing them. They are ostensibly claims for negligent supervision and respondeat superior liability, but the complaint does not make clear exactly what conduct is at issue. The parties' briefs discuss the torts of malicious prosecution and to a lesser extent, false arrest, but they fail to really tie those torts to the actual claims at issue. But the rub is that, concerning the negligent supervision claim (Count VIII) and respondeat superior liability for the same (Count IX), the relevant defendants assert full immunity from liability under the ITCA. They tell me that this immunity stems from the fact that supervision of government employees is a "discretionary function" and as such it is immune. *See* Ind. Code § 34-13-3-3(7); *Foster v. Pearcy*, 387 N.E.2d 446, 449–50 (Ind. 1979). The ITCA further provides immunity for torts which stem from the initiation of judicial proceedings, such as criminal charges. *See* Ind. Code § 34-13-3-3(6); *F.D. v. Indiana Dep't of Child Servs.*, 1 N.E.3d 131, 137 (Ind. 2013). Cooper all but concedes this statutory provision is fatal to his remaining claims under Indiana state law. Accordingly Count VII, for negligent supervision, and Count IX for respondeat superior liability for the same conduct, to the extent they are premised on state law, will be dismissed.

But my dismissal of the state law claims says nothing of Cooper's Section 1983 claim based upon the same malicious prosecution underpinnings. The ITCA's blanket immunity cannot abrogate Cooper's Fourteenth Amendment rights or insulate Indiana's governmental subdivisions or their employees from liability for willfully

violations of the United States Constitution. *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007) (holding that ITCA results in an inadequate state law remedy for constitutional violations); *Julian v. Hanna*, 732 F.3d 842, 846 (7th Cir. 2013) (same). The factual bases of those claims simply cannot be pursued under Indiana state law, but there is no bar based on the ITCA to keep Cooper from suing under Section 1983 for the same facts.

## Conclusion

For the foregoing reasons, the defendants' Motion for Judgment on the Pleadings [DE 45] is GRANTED with regard to Count VIII (negligent supervision under Indiana law), Count IX (respondeat superior liability for state malicious prosecution), Count X (intentional infliction of emotional distress under Indiana law) and Count XI (negligent infliction of emotional distress under Indiana law); Counts X and XI are DISMISSED; defendants' Motion for Judgment on the Pleadings [DE 45] is DENIED in all other respects.

SO ORDERED on January 29, 2019.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT