# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

KEITH COOPER,                    )
                                 )
    Plaintiff,          )
                                 )
    v.                  )      CASE NO. 3:17-CV-834-PPS-MGG
                                 )
STEVE REZUTKO, *et al.*,          )
                                 )
    Defendants.         )

## OPINION AND ORDER

Pending and ripe before the Court are three motions regarding subpoenas sent to non-parties by parties in this case.

Defendant, City of Elkhart, served a subpoena on South Bend Tribune Corporation ("the Tribune"), a newspaper that has published articles about this action and related underlying facts. On July 26, 2018, the Tribune filed its motion to quash the subpoena. [DE 39]. On August 16, 2018, the Tribune filed a related motion to strike portions of an affidavit submitted by the City as part of its response to the Tribune's motion to quash. [DE 44].

Plaintiff served subpoenas on Elkhart County Prosecutor Vicki E. Becker ("Becker"), whose office prosecuted Plaintiff leading to a criminal conviction relevant to this civil action, and the Michigan Department of Corrections ("MDOC"), where an individual allegedly involved in the underlying crime is incarcerated. On September 13, 2018, Becker filed a motion to quash the subpoena issued to her office. [DE 56]. On

January 21, 2019, Plaintiff filed a motion to compel MDOC to produce the information requested in its subpoena. [DE 74].

The Court addresses each motion in turn.

I.      **GENERAL BACKGROUND**

In 1996, Plaintiff was arrested and convicted for armed robbery in Elkhart County, Indiana after being identified by witnesses as the shooter at the crime scene. He was sentenced to 40 years in prison.

By 2006, however, it was revealed that DNA evidence had been recovered from a baseball cap left at the scene—presumably the hat worn by the shooter. The DNA on the cap connected it to an individual named Johlanis Ervin, not Plaintiff. With this evidence, Plaintiff filed a petition for post-conviction relief before the Indiana Court of Appeals as well as a motion to modify his sentence. When the court granted his motion to modify his sentence in April 2006, Plaintiff was released from prison and withdrew his petition for post-conviction relief. Plaintiff then petitioned the Governor of Indiana for a pardon in 2011. After hearing testimony in 2014 that witnesses to the armed robbery had falsely identified Plaintiff as the shooter, the Indiana Pardon and Parole Board recommended that the Governor pardon Plaintiff. On February 9, 2017, Indiana Governor Eric J. Holcomb pardoned Plaintiff.

Plaintiff's co-defendant for the 1996 armed robbery, Christopher Parish, followed a somewhat different path to justice. In 2005, Parish was released from prison when the Indiana Court of Appeals overturned his criminal conviction and ordered a new trial. *Parish v. City of Elkhart, Indiana*, 702 F.3d 997, 998 (7th Cir. 2012). Parish then refused a

plea offer after which the Elkhart prosecutor dismissed the charges against him. Based on events leading to and arising from his criminal conviction, Parish filed a Section 1983 civil rights action in this Court. A jury in 2010 concluded that Parish was framed by the Elkhart police officers who investigated the 1996 robbery and that the violations of Parish's constitutional rights resulted from the City of Elkhart's failure to train, discipline, and supervise.

Plaintiff filed his parallel Section 1983 civil rights complaint in this Court on November 6, 2017, after he was pardoned. Through his complaint, Plaintiff alleges that Defendants Steven Rezutko[1], Steven Ambrose, Edward Windbigler, and Tom Cutler ("Defendant Officers")—the officers of the Elkhart Police Department involved in the investigation and prosecution of both Plaintiff and Parish for the 1996 armed robbery— improperly and intentionally coerced witnesses to fabricate incriminating evidence against him and concealed exculpatory evidence from him and the Elkhart Prosecutor who ultimately tried him. Plaintiff further contends that these officers coordinated their efforts to convict him of the armed robbery. Plaintiff's complaint raises constitutional claims of (1) denial of due process, (2) malicious prosecution, (3) Fourth and Fourteenth Amendment violations for fabricating false evidence, (4) supervisory liability for certain defendants, (5) failure to intervene, and (6) conspiracy to deprive him of his

---

[1] The Court notes that in a separate motion, the Defendant Officers' counsel reported that "[o]n February 5, 2019, [he] learned that Defendant Steven Rezutko passed away." [DE 82 at 2, ¶¶ 7–9]. Plaintiff's counsel indirectly confirms Rezutko's death in a separate filing where he referenced "certain tragic developments [that] occurred yesterday relating to Defendant Rezutko." [DE 83 at 2, ¶ 5]. While a motion for substitution of the proper party under Fed. R. Civ. P. 25(a)(1) may follow in due course, the Court will reference Mr. Rezutko in this order as he was referenced in the relevant motions and briefs.

constitutional rights against the Defendant Officers. Plaintiff's complaint also raises a *Monell* claim against the City of Elkhart for a practice and policy that led to the violations of his constitutional rights by the Defendant Officers.[2]

On February 20, 2018, this Court entered its Rule 16(b) Scheduling Order establishing case management deadlines including a deadline of May 1, 2019, for the close of discovery to be followed by expert discovery. [DE 28 at 1–2]. As part of its discovery efforts, the City of Elkhart served a subpoena on the Tribune on June 27, 2018. [DE 39-33]. Plaintiff also sought information from non-parties when he served Becker and MDOC a subpoena on August 17, 2018 [DE 56 at 18–24], and November 19, 2018 [DE 74-1] respectively. Those subpoenas are now the focus of the Court's attention.

## II.  MOTIONS TO QUASH

### A.  Legal Standard

Federal Rule of Civil Procedure 45(a) authorizes parties to issue subpoenas to non-parties as part of their discovery efforts. "The scope of material that is obtainable through a [Rule 45] subpoena is as broad as that which is otherwise permitted under the discovery rules." *Teton Homes Europe v. Forks RV*, No. 1:10-CV-33, 2010 WL 3715566, at *2 (N.D. Ind. Sept. 14, 2010). Accordingly, Rule 45 implicitly requires that a subpoena seek relevant information. *Lee v. City of Elkhart*, No. 2:12-CV-25-TLS-APR, 2013 WL 1754977, at *2 (N.D. Ind. Apr. 22, 2013).

---

[2] On January 29, 2019, this Court granted Defendants' motion for judgment on the pleadings in part dismissing Plaintiff's supplemental state law claims for "negligent supervision against defendant Cutler and other supervisors (Count VIII), a respondeat superior liability claim against the City of Elkhart for the same conduct (Count IX), and . . . intentional infliction of emotional distress (Count X) and negligent infliction of emotional distress (Count XI) claims against the individual defendants." [DE 77 at 21–23].

Rule 45 also provides a mechanism to protect persons subject to subpoenas. Specifically, Rule 45(d)(1) directs "the party or attorney responsible for issuing and serving a subpoena [to] take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." The court is then required to enforce this duty on the serving party or attorney. Fed. R. Civ. P. 45(d)(1). To invoke this enforcement clause, a person subject to a subpoena may file a motion to quash the subpoena. Fed. R. Civ. P. 45(d)(3).

"On timely motion, the court for the district where compliance is required must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies; or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). "The party seeking to quash a subpoena under [Rule 45(d)(3)(A)] bears the burden of demonstrating that the information sought is privileged or subjects a person to an undue burden." *Malibu Media, LLC v. John Does 1-14*, No. 1:12-CV-263, 2013 WL 2285950, at *2 (N.D. Ind. May 22, 2013).

### B. The Tribune's Motion to Strike

Before reaching the Tribune's motion to quash, the Court addresses its Motion to Strike portions of the Declaration of Defendant Edward A. Windbigler, dated August 9, 2018, filed on August 16, 2018. The City filed the Declaration in support of its arguments in opposition to the Tribune's motion to quash the subpoena the City served on it. The motion to strike became ripe on September 4, 2018, after full briefing.

Through its motion, the Tribune asks the Court to strike paragraphs 6 and 7 of Windbigler's Declaration. Paragraphs 6 and 7 recount conversations Windbigler had

with a non-party named Larry Towns in November 2017. The Tribune contends these paragraphs should be stricken because Towns's statements constitute inadmissible hearsay. The City does not dispute that Windbigler's representation of Towns's statements constitutes hearsay but presents arguments distinguishing paragraphs 6 and 7 and suggesting that the Court may and should consider the Windbigler Declaration in its entirety when deciding the Tribune's motion to quash.

As seen in the analysis below, the Court only used used Windbigler's paragraphs 6 and 7 to provide context for the Tribune's motion to quash. The Court resolved the substantive issues related to the Tribune's motion to quash without relying upon the facts alleged in those paragraphs to prove the truth of the matters they assert. Therefore, there is no need to strike paragraphs 6 and 7 of Windbigler's Declaration or to decide now whether they constitute inadmissible hearsay. Accordingly, the Court **DENIES** the Tribune's motion to strike as irrelevant. [DE 44].

C.     **The Tribune's Motion to Quash**

1.     **Relevant Background**

The South Bend Tribune is a daily newspaper serving the City of South Bend and surrounding communities, including the City of Elkhart, Indiana. The Tribune has published several news articles and opinion pieces since 1997 about Plaintiff and his criminal conviction, his pardon, and the instant lawsuit against the Defendant Officers and the City of Elkhart.

While working on Plaintiff's story over the years, Tribune reporters have gathered information from publicly-available court documents, materials obtained

through Public Records Act requests, and individual interviews with Plaintiff, his attorney Elliot Slosar, and others. Some individuals, including Defendants Rezutko and Ambrose and the City of Elkhart's attorney declined to be interviewed.

The Tribune's most recent investigation and reporting efforts regarding Plaintiff's post-conviction proceedings began in July 2016. The Tribune reporter then working on Plaintiff's story communicated with Plaintiff's attorney as early as February 2017. In April 2017, the reporter served his initial Public Records Act requests related to this matter on the City. In October 2017, the Tribune's reporters and editors became aware of the ProPublica Local Reporting Network ("ProPublica LRN")[3] and began discussing whether to apply for one of its grants for local reporting related to Plaintiff's case. Mr. Slosar was then interviewed by the Tribune reporter and an editor on October 24, 2017, at which time the reporter informed him that the Tribune was applying for the ProPublica LRN grant. In early December 2017, the Tribune learned that ProPublica had awarded it a grant. The Tribune published two articles related to Plaintiff's case in the summer of 2018 based upon co-reporting with ProPublica that was identified in the articles' bylines. [*See* DE 42-10, DE 42-11].

Notably, not all of the information reporters gathered regarding Plaintiff's case was incorporated into published Tribune articles over the years. Moreover, the Tribune

---

[3] ProPublica is an independent, non-profit newsroom that uses the "moral force of investigative journalism to spur reform through the sustained spotlighting of wrongdoing." *About Us: The Mission*, ProPublica https://www.propublica.org/about/ (last visited Feb. 21, 2019). Its Local Reporting Network "support[s] local and regional newsrooms as they work on important investigative projects affecting their communities" on topics including criminal justice. *About Local Reporting Network*, ProPublica https://www.propublica.org/local-reporting-network/ (last visited Feb. 21, 2019).

maintained the confidentiality of the unpublished information preventing its disclosure to other media outlets and the general public.

On June 27, 2018, the City of Elkhart served a subpoena on the Tribune seeking

Correspondence, letters, emails, texts, memos or other documents showing any communications or meetings between the Plaintiff, Keith Cooper or his attorneys, Elliot Slosar, Jon Loevy, Arthur Loevy, Gayle Horn, Heather Donnell Lewis, or any representative of the law firm of Loevy & Loevy and anyone from the South Bend Tribune news organization from January 2009 to the present concerning the Plaintiff, his pardon request, or any of the allegations in the Complaint.

[DE 39-33 at 4]. The only responsive information the Tribune claims to possess is (1) text messages and e-mails with Mr. Slosar, Plaintiff's attorney; (2) reporter's notes from interviews with Plaintiff and Mr. Slosar; (3) video of an interview of Plaintiff by a Tribune reporter; and (4) audio recordings of Plaintiff and Mr. Slosar. The Tribune states that some of this information was reported in the articles it published. However, the Tribune refused to produce the unpublished information arguing that it was privileged and its production would be unduly burdensome.

On July 6, 2018, the Tribune's attorney contacted the City's attorney to discuss whether the subpoena could be withdrawn or narrowed but such an agreement could not be reached. In the course of the conversation, the City's attorney revealed that he had requested the same information from both the Tribune and Plaintiff with the intent to compare the responses. Plaintiff produced emails and text messages responsive to the City's discovery request on August 31, 2018. The communications produced, some of which were redacted, were dated between February 15, 2017, and June 22, 2018. The City is not convinced that Plaintiff's responses provide the complete universe of

responsive communications. Therefore, the City claims it still requires the Tribune's responses to the same request to ascertain what is missing from Plaintiff's production. The record does not reflect any further effort by the City to secure complete production of the relevant communications directly from Plaintiff.

Substantively, the City argues that the Tribune subpoena requests relevant information. Specifically, the City contends that the requested information could include information about the changing testimony of witnesses related to the 1996 robbery and photographs used in the original prosecution of Cooper that are no longer publicly available due to an expungement order. However, the City primarily argues that the requested information could expose a cooperative agreement between the Tribune's reporter and Plaintiff's attorney to exchange information to advance Plaintiff's interests or to advance his attorneys' interests in other litigation. The City suspects such a conspiratorial relationship largely because of testimony in Defendant Windbigler's Declaration. [DE 42-13].

At the time of his Declaration, Windbigler was the Chief of the Elkhart Police Department ("EPD"), a position he had held since January 1, 2016. Before becoming Chief, he served as a police officer on the EPD for about 24 years then worked as an investigator for the Elkhart Prosecutor's Office. The bulk of Windbigler's Declaration discusses a telephone conversation and visit he had with non-party Larry Towns in November 2017. According to Windbigler, Towns—another former Elkhart police officer—was working on this case as an investigator for and with Plaintiff's attorney. The Declaration states that Towns told Windbigler

that a public interest organization and a reporter of the South Bend Tribune were getting grant money from or with the help of Cooper's lawyers to do investigative reporting of past criminal cases in Elkhart [and] that the lawyers were then going to use the information gathered in those investigation reports to file more law suits against the Elkhart Police Department.

[DE 42-13 at 2, ¶ 7].

Windbigler also averred that the City and the EPD received twelve public records requests from the Tribune for documents regarding this lawsuit and past criminal investigations of Andrew Royer, another individual alleging he was wrongfully convicted based upon EPD conduct. [DE 42-13 at 2, ¶ 8]. The City also cites to two Tribune articles—one co-reported by ProPublica reporter—establishing that Plaintiff's attorneys also represent Andrew Royer and ProPublica Illinois, ProPublica's regional publishing operation.

In this context, the Court now addresses the Tribune's motion to quash

### 2. Analysis

To succeed on its motion to quash, the Tribune must demonstrate that the information requested in the subpoena is privileged or other protected matter, or that its production constitutes an undue burden. *Malibu Media, LLC*, 2013 WL 2285950, at *2; *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv).

### a. Privileged or Other Protected Matter

Media sources are not entitled to greater protection than any other non-party under Rule 45. *McKevitt v. Pallasch*, 39 F.3d 530, 532–33 (7th Cir. 2003). Indeed, despite considerable litigation, the Seventh Circuit has not recognized a federal reporter's

privilege under the First Amendment for information from non-confidential sources. *Id.* Instead, "courts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances." *Id.* In other words, media sources are entitled to the same protections available to any other non-press person or entity under Fed. R. Civ. P. 45. *See Hobley v. Burge*, 223 F.R.D. 499, 505 (N.D. Ill. 2004) ("There is nothing in the Federal Rules that suggests that research for the purpose of news reporting is to be given *less* protection than research for the purpose of product development.").

Applying the *McKevitt* standard, the Northern District of Illinois in *Hobley* denied part of a motion to quash a subpoena directed to a reporter after finding the request for plaintiff's unsolicited letters to the reporter reasonable because they were not sent anonymously or under a promise of anonymity. *Id.* Yet the *Hobley* court simultaneously granted part of the same motion to quash protecting from disclosure the reporter's handwritten notes from conversations with and about the plaintiff. *Id.* The court reasoned that production of the notes would pose an undue burden on the reporter to disclose confidential research for which the requesting party did not show a substantial need that could not otherwise be met. *Id.*

In a different case, the same court found audio and video recordings of interviews conducted by a reporter more comparable to the protected reporter's notes in *Hobley* than the unsolicited letters. *Patterson v. Burge*, No. 03 C 4433, 2005 WL 43240, at *4 (N.D. Ill. Jan. 6, 2005). Finding a weak showing of materiality by the requesting parties, lack of any compelling public interest in disclosure, and a significant burden on

important private and public interests imposed by compelled production in that particular case, the *Patterson* court quashed the subpoena requesting such recordings from the news organization. *Id.* at *5.

These cases are instructive here where the Tribune seeks protection from disclosure of unpublished information collected by its reporters, including text messages and emails between the Tribune's reporters and plaintiff's attorney, a video interview of Plaintiff by a Tribune reporter, audio recordings of Plaintiff and his attorneys, and reporter's notes from interviews with Plaintiff and his attorneys. Like the *Hobley* reporter's notes and the *Patterson* recordings, the information the City seeks from the Tribune reflects the reporting and editorial process engaged in by the reporters handling Plaintiff's story. While the Court cannot know the content of these messages, notes, and recordings, nothing before the Court now suggests that they reflect any direct solicitation of the Tribune by Plaintiff or his attorneys.

Nevertheless, the City appears to be looking for just that kind of solicitous information to support their conspiracy theory. The City's request is misplaced for a couple of reasons. First, the requested unpublished information constitutes protectable trade secrets and confidential research or commercial information protected under Indiana law. In Indiana,

> "[t]rade secret means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind. Code § 24-2-3-2. Information from sources—confidential or public—is the currency of all news organizations. That information loses value when it is disclosed to other media sources or to the public before the organization can publish the information itself. Indeed, news organizations strive daily to maintain a competitive edge for their product, whether that is a newscast, a newspaper, a blog, a magazine, or a radio story. Their strategy is to support reporters in their investigative efforts to generate the information, also known as "a scoop," necessary to build and keep the buying public's loyalty to their product.

Here, the City is asking the Tribune to disclose information that dictates its success and competitive edge—unpublished information identified through the Tribune's reporters' investigative efforts. Thus, the requested information derives its economic value to the Tribune by its confidential or unpublished nature. And the Tribune has intentionally and reasonably kept the information secret. Thus, the requested information is protected as trade secrets.

Second, the City's suspicions about a conspiracy between the Tribune and Plaintiff's attorneys are not supported by the evidence currently before the Court. The City views the communications already produced by Plaintiff through a cynical lens that sees conspiracy behind every corner. For instance, the City paraphrases an email exchange between Plaintiff's attorney and the Tribune reporter as a "suggest[ion] that they meet to plan strategy to advance their mutual interests" [DE 64 at 5] when the cited

13

documents never use the phrases "planning strategy" or "mutual interests" [DE 64-1 at 3–4]. Instead, the emails show a reporter requesting an interview from an individual directly involved in the issue he is researching and attempting to coordinate a mutually agreeable date and time for the interview while giving the interviewee an idea of the scope of the anticipated interview.

The City cites to other examples of communications that it interprets as evidence of conspiracy when they simply reflect a reporter doing what a reporter does— pursuing sources with information about the story, identifying inconsistencies in a story and confronting the relevant characters with that information, giving both sides to a story a chance to be heard. Moreover, the City complains about the appearance of bias in the Tribune's reporting, but fails to acknowledge that none of its agents agreed to be interviewed. As a result, the City provided the Tribune with nothing to sway its perspective or to even be represented in the articles. Thus, it cannot be surprising that the Tribune's articles tended to favor Plaintiff's perspective.

In the end, the Tribune subpoena is neither reasonable nor proportional. While no one disputes that the requested information could be relevant or lead to relevant admissible evidence, the City has not demonstrated sufficient materiality or a compelling public interest in the Tribune's unpublished and protectable information to justify exposing it. *See Patterson*, 2005 WL 43240, at *5. Moreover, production of the requested information would constitute an undue burden on the Tribune as discussed below.

### b.    Undue Burden

To determine whether a subpoena causes an undue burden, the court balances the burden of compliance on the subpoenaed non-party against the benefits to the serving party from the requested production. *Patterson*, 2005 WL 43240, at *1. Undue burden is "more than mere administrative hardship" and "encompasses the interests that enforced production would compromise or injure." *Id.* Thus, key factors for the court to consider "include non-party status, relevance, the issuing party's need for the discovery, and the breadth of the request." *Ranburn Corp. v. Argonaut Great Cent. Ins. Co.*, No. 4:16-CV-88-RL-PRC, 2018 WL 4042852, at *1 (N.D. Ind. Aug. 24, 2018) (citing *Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F. Supp. 3d 811, 813 (N.D. Ill. 2015)). "[T]he undue burden calculus is more protective of nonparties than it is for parties" out of respect for the unwanted burden that a subpoena inherently thrusts upon non-parties. *Lee*, 2013 WL 1754977, at *3 (quoting *Charles v. Quality Carriers, Inc.*, No. 1:08-cv-00428-RLY-JMS, 2010 WL 396356, at *1 (S.D. Ind. Jan. 28, 2010)); *see also Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 188 (N.D. Ill. 2013).

Courts have demonstrated this extra care for non-party journalists and news organizations. This Court in particular has held that the compelled production of unpublished information received while a journalist was engaged in newsgathering activity poses an undue burden when (1) the requested material is not highly relevant, (2) the requesting party does not establish a compelling need sufficient to override the protections available to the information, and (3) the requesting party has not exhausted its options for securing the information from other sources. *See Longs v. Lebo*, Cause No.

3:07-CV-83 RM, 2009 WL 799533, at *4 (N.D. Ind. Mar. 24, 2009) (citing *May v. Collins*, 122 F.R.D. 535, 540 (S.D. Ind. 1988)).

As discussed above, the relevance of the requested information is not in question. Even if the City could establish a compelling need to override the requested information's protected status, which has already been shown to be unlikely at best, the City has failed to exhaust its options for securing the information from other sources. *See Hobley*, 223 F.R.D. at 505. In fact, the City has presented no evidence to suggest that it pursued all avenues available to it to secure complete responses to its parallel discovery request to Plaintiff and his attorney.

First, the City subpoenaed the Tribune before it knew what Plaintiff and his attorney could or would produce. Second, the City reports no effort to meet and confer with Plaintiff and his attorney to discuss what it perceives to be their incomplete responses. Third, the City has not filed a motion to compel seeking the Court's help in securing the requested information. Instead, the City seems to have chosen the strategy of imposing on the non-party Tribune to hold Plaintiff and his attorney in check. In so doing, the City appears to be attempting to coopt the Tribune's research and burdening its newsgathering efforts in the process. This unduly burdens the Tribune as a news organization that is not a party to this action.

### 3. Conclusion

As discussed above, the City's subpoena directed to the Tribune seeks production of unpublished information secured through the news gathering activities of the Tribune's reporters, information that the Tribune has taken efforts to keep secret

16

to protect its economic value. Therefore, the requested information constitutes trade secrets and confidential research or commercial information protected from disclosure. Moreover, the City is unduly burdening the Tribune—a non-party news organization—by seeking information without exhausting its options for securing the same information from Plaintiff and his attorney. Accordingly, the Tribune subpoena is not reasonable under the circumstances of this case.

Therefore, the Court **GRANTS** the Tribune's motion to quash. [DE 39].

### D.    Becker's Motion to Quash

On September 13, 2018, non-party Elkhart County Prosecutor, Vicki E. Becker ("Becker"), filed a Motion to Quash Subpoena. Plaintiff filed a response in opposition to Becker's motion on October 4, 2018. Becker filed no reply brief making her motion ripe for the Court's consideration on October 13, 2018. [*See* DE 69].

### 1.    Relevant Background

Plaintiff served a subpoena on Becker on August 17, 2018 seeking production of requested information outlined in 22 paragraphs by September 4, 2018. [DE 56 at 18–24]. Becker produced approximately 2367 pages of responsive information to Plaintiff. [DE 56 at 15]. In a letter dated September 7, 2018, however, Becker informed Plaintiff's counsel that she would be filing a motion to quash related to Paragraphs 8–11, as deemed necessary, and Paragraphs 14–19, which she described as "outside the scope of reasonable discovery, privileged, and/or unduly burdensome to produce." [DE 56 at 15]. Becker's motion to quash ultimately argued against production of information responsive to Paragraphs 8, 11, and 14–19.

Paragraphs 8 and 11 of Plaintiff's subpoena request production of "[a]ny and all Documents, including electronic Communications, relating to Elliot Slosar" and his law firm, Loevy & Loevy. [DE 56 at 22]. Paragraphs 14 through 19 request production of any and all documents and communications related to the investigations and prosecutions of six other individuals including (1) four EPD informants, one of whom testified against Plaintiff and later recanted; (2) one individual who falsely confessed to a murder as part of an EPD investigation; and (3) Christopher Parish, Plaintiff's co-defendant in proceedings related to the 1996 robbery and shooting. [DE 56 at 22–23]. Becker reports having produced information relevant to Plaintiff's claims in this case and his underlying prosecution but argues that information related to other prosecutions are overbroad and constitute a fishing expedition at the Prosecutor's Office's expense. Moreover, Becker argues that Plaintiff's "any and all" descriptors outline categories of information that would be unduly burdensome for the Prosecutor's Office to produce.

### 2.    Analysis

As outlined above, Becker—a non-party—is entitled to a bit more protection from burdensome discovery than the parties to this litigation. *See Lee*, 2013 WL 1754977, at *3; *Parker*, 291 F.R.D. at 188. Nevertheless, Becker—as the non-party seeking to quash Plaintiff's subpoena—still "bears the burden of demonstrating that the information sought is privileged or subjects a person to an undue burden." *Malibu Media, LLC*, 2013 WL 2285950, at *2. Becker's emphasis on the relevance of the requested information fails to establish that it constitutes information protected from disclosure given the liberal

scope of discovery under Fed. R. Civ. P. 26(b)(1) applicable even to subpoenas under Fed. R. Civ. P. 45.

Becker urges the Court to define the scope of discovery narrowly to include only information related to Plaintiff's prosecution. Such information would indeed be discoverable. However, Becker fails to consider the broader scope of information necessary and relevant to Plaintiff's *Monell* claim against the City of Elkhart.

To establish municipal liability for constitutional violations under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978), a plaintiff must establish a constitutional harm caused by (1) an official policy promulgated by the municipality's officers; (2) a practice or custom, though not official, that is widespread; or (3) a policy approved of or adopted by an official with final policy-making authority as to the municipality. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Here, Plaintiff alleges multiple theories of *Monell* liability including (1) that the EPD had a pattern and practice of withholding material, exculpatory, and impeachment information from prosecutors and defense attorneys in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) that the EPD had a pattern and practice of using informants and third party witness inducements that was not disclosed to the prosecutor. *Monell* claims for such due-process violations are doomed if they do not identify other instances of comparable unconstitutional conduct. *Connick v. Thompson*, 131 S.Ct. 1350, 1353 (2011). Thus, *Monell* "claims often require a broad and substantial amount of discovery that would not be involved if the plaintiff sued only the individuals directly

involved in the deprivation of his rights." *Awalt v. Marketti*, No. 11 C 6142, 2012 WL 6568242, at *3 (N.D. Ill. Dec. 17, 2012).

Therefore, Plaintiff's requests for information in Paragraphs 14–19 regarding others who were prosecuted as the result of EPD investigations and EPD informants familiar with its practices are clearly within the range of comparator evidence relevant to Plaintiff's *Monell* claims.

Becker also fails to recognize the relevance of the Prosecutor's Office's recorded references to Plaintiff's attorneys in light of Defendants' allegations that witnesses against Plaintiff related to his underlying conviction were coerced to recant by Plaintiff's counsel. In fact, Plaintiff cites to the transcript of a 2017 hearing in his underlying state court proceedings where Becker herself argued that third party witnesses who testified against Plaintiff changed their stories after talking to Plaintiff's attorney. [*See* DE 65 at 15 (citing DE 65-8 at 8:24; 22:6–8)]. Thus, Becker's file related to Plaintiff, including any documentation or communications to anyone regarding Plaintiff, his counsel, or the recanting witnesses, especially Paragraphs 8 and 11, is relevant and discoverable. Any work product argument also fails because Becker's file was not created in anticipation of this litigation.

Therefore, the relevance of the discovery requests Becker challenges in the instant motion cannot, on its own, justify quashing the subpoena. Moreover, by failing to submit any reply brief objecting to Plaintiff's arguments demonstrating relevance as discussed above, Becker has essentially conceded the relevance argument. Similarly,

Becker's lack of reply leaves the Court to assume that she has acquiesced to Plaintiff's position that responding to the subpoena would not be unduly burdensome.

As such, the Court **DENIES** Becker's motion to quash. [DE 56]. Becker is **ORDERED** to produce complete responses to Paragraphs 8, 11, and 14–19 of Plaintiff's subpoena on or before **March 15, 2019**. Additionally, the Court **ACKNOWLEDGES** Plaintiff's statement that Becker has provided no responses to Paragraph 9 of the subpoena. Becker developed no argument to quash the Paragraph 9 request and therefore waived any such argument. *See Puffer v. Allstate Ins. Co.*, 675 F.ed 709, 7018 (7th Cir. 2012) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1992)). Accordingly, Becker is also **ORDERED** to produce complete responses to Paragraph 9 of Plaintiff's subpoena on or before **March 15, 2019**.

III.    PLAINTIFF'S MOTION TO COMPEL

On January 21, 2019, Plaintiff filed his Motion to Compel the Michigan Department of Corrections' Compliance with Subpoena for Records. Plaintiff's subpoena to MDOC, served on November 19, 2018, sought production of records relating to Johlanis Ervin—the individual implicated in the 1996 armed robbery and currently incarcerated at MDOC's Ionia Correctional Facility. Plaintiff intends to put forth evidence at trial before this Court that Ervin was the shooter in 1996.

According to the subpoena, MDOC's deadline to produce responsive information was December 7, 2018. According to Plaintiff, MDOC has not produced the requested documents despite Plaintiff's counsel's efforts to discuss and resolve the issue

with MDOC's staff. Most recently, Plaintiff reported that MDOC had initiated contact with Plaintiff's attorney and promised responsive production during the week of February 18, 2019. [DE 93 at 2, ¶ 4]. Based on that representation and at Plaintiff's request, the Court stayed ruling on the instant motion to compel to allow time for MDOC's compliance with the subpoena. [DE 94]. Yet as of this date, Plaintiff has not filed a motion to withdraw its motion to compel leading the Court to assume that MDOC still has not produced responses to Plaintiff's subpoena. Therefore, the stay has automatically lifted and the Court turns its attention to resolution of Plaintiff's motion to compel. [*See* DE 94].

In addition to failing to produce responses to Plaintiff's subpoena, MDOC has failed to file any brief in response to the instant motion to compel despite being afforded more than 14 days to do so. *See* N.D. Ind. L.R. 7-1(d)(2)(A).[4] Without any response from MDOC, the Court would be within its authority to summarily grant Plaintiff's motion. *See* N.D. Ind. L.R. 7-1(d)(4). However, Plaintiff's statements in his motion about the nature of the dispute with MDOC give the Court pause.

The only clue in the record as to MDOC's lack of production is an email dated December 4, 2018, from the Warden's Administrative Assistant confirming receipt of the subpoena and then stating: "We are not obligated to a Subpoena not signed by a Michigan judge. The documents requested if exists will need to be requested through

---

[4] Plaintiff's Certificate of Service indicates his intent to deliver a copy of the motion to compel to Lisa Geminick at the MDOC Office of Legal Affairs "*via* overnight mail to be delivered by January 23, 2019." [DE 74 at 6]. The Court assumes that Ms. Geminick received the motion on behalf of MDOC as intended by January 23, 2019. More than 14 days have passed since that date as well giving MDOC more than enough time to have entered an appearance and filed any response to Plaintiff's motion.

FOIA." [DE 74-2 at 1]. The Administrative Assistant later directed Plaintiff's counsel to contact Lisa Geminick in the Office of Legal Affairs with further questions. [DE 74-4 at 1]. Plaintiff's counsel's multiple attempts to contact Ms. Geminick failed.

Through the instant motion, Plaintiff argues that this Court has authority to enforce subpoenas against non-parties and that MDOC has waived any argument regarding any perceived defects in the subpoena by failing to timely file any motion to quash the subpoena. *See* Fed. R. Civ. P. 45(c)(3)(A). Such arguments combined with a non-party's silence would typically cause this Court to grant a motion to compel like the one at issue here. However, the record leaves open the possibility that MDOC's hands are tied by laws or regulations requiring the signature of Michigan judge presumably to validate or authorize the subpoena. Indeed, this Court is unfamiliar with the legal limits applicable to MDOC facilities and does not want to interfere in the affairs of the State of Michigan.

With that said, MDOC's failure to respond to Plaintiff's instant motion to compel actually ties this Court's hands. MDOC clearly had notice of the subpoena as evidenced by the Warden's Administrative Assistant's emails to Plaintiff's counsel. Moreover, MDOC has further demonstrated notice of the subpoena by initiated contact with Plaintiff's counsel through the Michigan Department of the Attorney General and its own attorney in the last two weeks. [*See* DE 93]. Yet MDOC still has filed nothing to object to the subpoena or to explain any limitations it faced under Michigan law despite being afforded sufficient time to do so. *See* Fed. R. Civ. P. 45(d)(2)(B); (d)(3). Without any explanation from MDOC, the Court is left to consider Plaintiff's subpoena pursuant

to the applicable Federal Rules of Civil Procedure. As noted above, Rule 45 clearly authorizes subpoenas like Plaintiff's to non-parties and mandates compliance from non-parties like MDOC.

Therefore, the Court **GRANTS** Plaintiff's uncontested motion to compel. [DE 74]. MDOC must produce all the documents requested through Plaintiff's subpoena on or before **March 15, 2019**.

IV.    CONCLUSION

For the reasons stated above, the Court now

(1)    **DENIES** the Tribune's motion to strike [DE 44];

(2)    **GRANTS** the Tribune's motion to quash [DE 39] the subpoena served on it by the City on June 27, 2018;

(3)    **DENIES** the Elkhart Prosecutor's motion to quash [DE 56] and **ORDERS** the Elkhart Prosecutor to produce complete responses to Paragraphs 8–9, 11, and 14–19 of Plaintiff's subpoena on or before **March 15, 2019**; and

(4)    **GRANTS** Plaintiff's motion to compel [DE 74] and **ORDERS** MDOC to produce all documents requests through Plaintiff's subpoena on or before **March 15, 2019**.

**SO ORDERED** this 26th day of February 2019.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge