UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KEITH COOPER,

        Plaintiff,

              v.                               CASE NO. 3:17-CV-834-PPS-MGG

STEVE REZUTKO, et al.,

        Defendants.

## OPINION AND ORDER

Pending and ripe before the Court are six discovery-related nondispositive motions. [DE 197, DE 200, DE 206, DE 208, DE 232, and DE 246]. Each motion is addressed in turn below.

## I.   GENERAL BACKGROUND

This case arises from the 1996 robbery and shooting of Michael Kershner in Elkhart, Indiana for which Plaintiff Keith Cooper ("Cooper") was convicted in 1997. At the trial, Cooper was found to be the tall African American man, accompanied by a short African American man, who struggled with Kershner and shot him during the robbery. A key piece of evidence was a hat—a customized baseball hat with a jeweled "J" on it ("the J Hat")—worn by the "tall man" and left behind at the scene. The DNA obtained from the J Hat was originally tested in 1997 by the Indiana State Police ("ISP") Laboratory. At Cooper's trial, the ISP lab report was stipulated into evidence along with the opinion of the ISP lab analyst who indicated that neither Cooper nor any other person could be eliminated as having possibly worn the hat. At the time of the trial, no

match had been found for the DNA recovered from the J Hat. Five years later, after Cooper was convicted and sentenced to 40 years in prison, the DNA samples were re-tested using a new technique that led lab technicians to identify a specific DNA evidentiary profile.

In the meantime, Indiana Deputy Public Defender William D. Polansky ("Polansky") was assigned to represent Cooper in post-conviction relief ("PCR") proceedings. Polansky requested the DNA evidentiary profile obtained from the J Hat be run in the state and federal databases to see if it could be matched to an individual. In March 2004, the ISP lab informed Polansky that the DNA profile from the J Hat had been matched to a Michigan Department of Corrections inmate named Johlanis Ervin. Polansky's investigator in the Indiana Public Defender's office, Harold Bailey, visited Ervin at his prison in Ionia, Michigan on March 25, 2004. On April 16, 2004, both Bailey and Polansky visited Ervin in Ionia. On August 18, 2008, Ervin was also visited by Cooper's current counsel, Elliot Slosar, who was not yet representing Cooper but was then representing Cooper's co-defendant in the Kershner matter, Christopher Parish, in a civil rights action before this Court[1].

Ultimately, Cooper withdrew his PCR petition after his sentence was modified in April 2006. In February 2017, Cooper was pardoned by Indiana Governor Eric J. Holcomb. Shortly thereafter, Cooper initiated the instant action alleging that his constitutional rights were violated when Defendant Elkhart Police Officers ("Defendant

---

[1] Case No. 3:07-cv-452-RLM. A jury verdict was returned in favor of Parish on October 27, 2010. [DE 193].

Officers")[2], acting individually and pursuant to Defendant City of Elkhart's ("the City's") policy and practices, conducted a reckless investigation, deliberately withheld exculpatory evidence, made false reports, and falsely testified resulting in his wrongful conviction and imprisonment for the 1996 Kershner robbery and shooting. Discovery formally began on February 20, 2018, when this Court entered its original Rule 16(b) Scheduling Order. [DE 28]. In the midst of the discovery period, Defendant Steve Rezutko died on February 5, 2019. [DE 112]. On June 25, 2019, Diana Rezutko as Personal Representative of the Estate of Stephen Rezutko was substituted for Steve Rezutko as a defendant in this action. [DE 135].

Through the course of discovery, several discovery disputes arose and were resolved through Court orders. Afterward, the Court amended its Scheduling Order, thereby extending the case management deadlines as follows: completion of fact discovery by April 2, 2021; Cooper's expert disclosures by April 29, 2021; Defendants' expert disclosures by May 31, 2021; and completion of all fact and expert discovery by July 1, 2021 [DE 195 at 2]. As of this date, these expired deadlines still govern.

With the close of fact discovery approaching in late February and March 2021, the parties presented several new discovery disputes to the Court by motion. Some have already been resolved but six motions, related to three substantive discovery disputes, remain pending. More specifically, issues pending before the Court include (1) whether certain information the City requested from Polansky about his interactions

---

[2] Steve Rezutko, Edward Windbigler, Steven Ambrose, and Tom Cutler

with Ervin in 2004 should be protected from disclosure based upon the work product doctrine [DE 197 & 200]; (2) whether Cooper should be allowed to serve additional requests for admission on Defendants [DE 206 & 208]; and (3) whether the non-party Honorable Michael A. Christofeno should be protected from testifying in this case [DE 232]. Additionally, the parties propose competing expert discovery and dispositive motion deadlines to propel this case toward trial. [DE 246]. Each is addressed in turn.

II.   ANALYSIS

   A.   The City's Motion to Compel—Polansky Subpoena [DE 197]

      1.   Relevant Background

Over the course of discovery in this case, Defendants' investigator Steven Radde, the City's attorney Martin Kus, and his paralegal Natasha Felton visited Ervin at the Michigan prison where he is incarcerated five times in varying combinations between July 2, 2018, and November 12, 2018. After these visits, the City's team secured a Declaration from Ervin dated November 12, 2018. [DE 221-5].

In his November 2018 Declaration, Ervin described being robbed by two African American men—one tall and one stocky—in Benton Harbor, Michigan in the fall of 1996. Ervin reported that his friends William Edwards and Omar Nelums were present and victimized at the robbery. Ervin indicated that among the items stolen was his "new ball cap that had the letter 'J' embroidered in the middle of the front." [DE 221-5 at 2]. Ervin then described his 2004 meetings with Polansky and Bailey explaining that they showed him photographs of an African American man they identified as Keith Cooper who he immediately recognized as the tall African American man who robbed

him and his two friends in Benton Harbor in 1996. From another photograph, Ervin identified the hat—the J Hat—that was taken from him during the 1996 robbery.

Defendants had previously obtained Declarations from Nelums on September 17, 2018[3] [DE 221-11], and Edwards on October 23, 2018[4] [DE 221-12]. In their Declarations, Edwards and Nelums both described the 1996 Benton Harbor robbery nearly the same as Ervin later did. In a subsequent Affidavit, dated August 15, 2019, however, Nelums recanted stating that he was never the victim of a robbery in the fall of 1996; that he had answered the questions posed by Radde just as Radde wanted, convinced that it would help Ervin; and that Radde had promised to help him investigate his own post-conviction case. [DE 221-6].

Ervin refused to testify further despite being subpoenaed by Defendants for a deposition on November 1, 2019 [DE 221-8], and by Cooper for a deposition on January 13, 2021 [DE 221-9]. Similarly, Edwards refused to testify regarding his October 2018 Declaration at a deposition noticed for January 14, 2021. Nelums, however, testified at a deposition on January 12, 2021, affirming the recantation in his August 2019 Affidavit. [DE 221-10].

Throughout discovery, the City also sought information from Polansky, in part because Cooper had identified Polansky as a witness in his initial disclosures dated February 28, 2018. [DE 198-3 at 5]. First, the City served a subpoena for documents on

---

[3] Nelums did not describe visits from Bailey and Polansky in 2004. Instead, Nelums reported that he identified the photo of Cooper shown to him by the City's investigator, Radde, when he visited Nelums on August 6, 2018. [DE 221-11].

[4] Attached to Edwards' Declaration is a photo that he states is "the tall man who robbed us that night." [DE 221-12 at 3]. He says nothing about any visits from Bailey, Polansky, Radde, Kus, or Felton.

Polansky on November 15, 2018. [DE 198-6]. As relevant here, the City requested production of photographs he or Bailey showed Ervin during their 2004 visits, correspondence with Cooper referring to his or Bailey's meetings with Ervin, and notes taken at the time of the 2004 Ervin meetings. While Polansky's personal attorney indicated that Polansky could not produce any contents of his Cooper file without a court order or written consent from Cooper, Cooper and Polansky collectively responded to the subpoena stating that Polansky did not possess any of the photographs and objecting to the requests for correspondence and interview notes citing attorney-client privilege, work product doctrine, and undue burden. [DE 198-8].

Second, the City deposed Polansky on December 8, 2020. [DE 198-2]. During the deposition, Polansky refused to answer certain questions based on Cooper's counsel objection alleging that information about Polansky's 2004 conversation with Ervin is protectable work product.[5] Through his questioning, counsel for the City particularly sought from Polansky (1) some recitation of what Ervin said at the April 2004, interview [DE 198-2 at 79:22–80:23, 80:25–81:13, 81:19–83:1,83:17–84:22]; (2) his interview methods including what questions he asked Ervin [DE 198-2 at 76:8–18; 77:7–78:4] and what photos he showed to Ervin [*Id.* at 78:14–25, 79:2–11, 79:15–20]; (3) his purpose for the Ervin interview and his actions leading to the Ervin interview [*Id.* at 58:5–14, 67:16–68:1, 75:22–76, 75:22–76]; (4) confirmation of the existence of notes regarding Ervin's

---

[5] Cooper reports that he "is not asserting an attorney-client privilege over the information that the City seek to compel from Mr. Polansky related to the deposition questions regarding his meeting with Mr. Ervin on April 14, 2006." [DE 221 at 7 n.3]. As this is the only reference to the date "April 14, 2006," in any of the briefs, the Court assumes that Cooper inadvertently transposed numbers and that he is referring to the Polansky-Ervin meeting on April 16, 2004. The result regardless is that only the work product issue needs to be addressed in this instance.

identification of photos from Cooper's original trial record during his April 2004

interview [*Id.* at 87:2–17, 90:21–91:10]; and (5) information Bailey reported to him from

his own Ervin interview in March 2004 [*Id.* at 68:7–14]. Counsel for the City stated

explicitly that he was not asking for Polansky's thought processes during his 2004 Ervin

interview, his opinion or impression or response regarding what Ervin said, or how

information gleaned during the Ervin interview affected his strategy for Cooper's PCR.

[DE 198-2 at 80:24–81:4 ("And, again, I'm just asking for what was—what was said, if

anything by Mr. Ervin to you; that is, I don't want any mental impressions. I don't want

any strategies. I just want facts of what happened at the meeting.")].

　　　After exchanges with Cooper's counsel on the work product issue, the City filed

the instant Motion to Compel on February 26, 2021. Since being filed, two issues within

the Motion to Compel were mooted when Cooper agreed to disclose his March 14, 2006,

letter to Polansky and an April 7, 2004, notation on Polansky's time logs. [*See* DE 221 at

15]. Therefore, the only remaining issue in the City's Motion to Compel is whether the

work product doctrine protects Polansky from disclosing "what, if anything, Ervin told

[him] about the 1996 Benton Harbor robbery during their prison interview on April 16,

2004, and what photographs Ervin identified as depicting the man who robbed him."

[DE 234 at 6; *see also* DE 198 at 10].

### 2.    Legal Standard

　　　The work product privilege is codified in Federal Rule of Civil Procedure

26(a)(3), which provides:

a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

**(i)** they are otherwise discoverable under Rule 26(b)(1); and

**(ii)** the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

"[T]he work-product doctrine is designed to serve dual purposes: (1) to protect an attorney's thought processes and mental impressions against disclosure; and (2) to limit the circumstances in which attorneys may piggyback on the fact-finding investigation of their more diligent counterparts." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 621–22 (7th Cir. 2010). Thus, work product protection extends to an attorney's notes and memoranda of witnesses' oral statements because such documents tend to reveal the attorney's mental processes. *Upjohn Co. v. United States*, 449 U.S. 383, 399 (1981) (citing *Hickman v. Taylor*, 329 U.S. 495, 513, 516–17 (1947)). Moreover, "forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness." *Hickman*, 329 U.S. at 512–13; *see also Upjohn Co. v. United States*, 449 U.S. 383, 399–400 (1981). Nevertheless, "material, non-privileged facts" cannot be hidden from an opposing party in litigation. *Hickman*, 329 U.S. at 513.

Both "'opinion' work product, which reflects or reveals a lawyer's mental processes, [and 'fact' work product] are generally protected and can be discovered only in limited circumstances." *Caremark, Inc. v. Affiliated Comput. Servs., Inc.*, 195 F.R.D. 610,

616 (N.D. Ill. 2000). The protection afforded "fact" work product "may only be overcome if the party seeking production demonstrates both a substantial need for the materials and that it would suffer undue hardship in procuring the requested information some other way." *Logan v. Com. Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). "[T]his burden is difficult to meet and is satisfied only in 'rare situations, such as those involving witness unavailability.'" *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478 (N.D. Ill. 2002) (quoting *Trustmark Ins. Co. v. General & Cologne Life Re of Am.*, 2000 WL 1898518 * 3 (N.D. Ill. 2000)). Determining whether invasion of an attorney's work product is warranted, however, requires an analysis of each case's unique facts. *Cf. Hickman*, 329 U.S. at 513–14 (discussing competing interests of discovering the truth and protecting attorney mental impressions reflected in work product disputes then applying the standard to the unique facts of that case).

### 3. Work Product Status of Requested Information

There is no dispute that Polansky interviewed Ervin in anticipation of litigation—namely Cooper's PCR proceedings. Thus, Polansky's thought processes and mental impressions, before, during and after the Ervin interview are protectable opinion work product. Similarly, any facts relevant to Cooper's case here that Polansky gleaned from the Ervin interview are likely protectable fact work product.

The parties dispute, however, whether the oral summary of the Polansky-Ervin interview, sought through the City's deposition questions to Polansky, even qualifies generally as work product under Fed. R. Civ. P. 26(b)(3). The City argues it does not because it does not fall into the categories of "documents and tangible things" identified

as protectable in Rule 26(b)(3). Yet, the City's distinction of an oral summary from documents, materials, and tangible things is incongruous with the purposes of the work product doctrine. *See Sandra T.E.*, 600 F.3d at 621–22. After all, Polansky's testimony—an intangible thing—would be of no less value and would include the same information as if he drafted a memo—a document or tangible thing—summarizing the facts revealed by Ervin in his April 16, 2004, interview with Polansky. *See In re Sealed Case,* 856 F.2d 268, 273 (D.C. Cir. 1988) (noting that work product immunity has been extended "to oral statements made by witnesses to attorneys 'whether presently in the form of mental impressions or memoranda.'" (quoting *Hickman*, 329 U.S. at 512)).

The City also contends that its seeks nothing from Polansky reflecting his mental process as an attorney. In support, the City relies on this Court's decision in *Gingerich v. City of Elkhart Prob. Dep't*, 273 F.R.D. 532, 540 (N.D. Ind. 2011). In *Gingerich*, the plaintiff served an interrogatory on the defendant municipality seeking to identify individuals who reported her allegedly questionable conduct, their positions, dates of reports, and content of reports. *Id.* The defendant only produced four names describing their reports as "verbal" within a particular three-month window of time. *Id.* The defendant objected to any further response on the grounds of privilege. *Id.*

In *Gingerich*, the Court preliminarily found that the defendant had not met its burden to establish the applicability of any privilege. *Id.* Yet the Court still analyzed whether the requested information qualified as protectable work product. Citing *E.E.O.C. v. Jewel Food Stores, Inc.*, 231 F.R.D. 343, 346 (N.D. Ill. 2005), the Court held that the information sought through the plaintiff's interrogatory, which did not "ask[] who

was interviewed, what the investigation revealed, [and] for the source of [the respondent's] information," was not protectable work product because it revealed nothing about litigation strategy or mental processes. *Gingerich*, 273 F.R.D. at 540, 542. The Court reasoned that "factual interrogatories concerning the identities of potential witnesses who were interviewed and the substance of their statements do not provide insight into the attorney's mental process." *Id.* at 540. The Court further stated that "[c]ompetent counsel routinely obtain information through interviewing witnesses and reviewing documents, and are able to provide interrogatory responses that set forth only that factual information without revealing 'mental processes, impressions and strategies.'" *Id.* (quoting *Jewel*, 234 F.R.D. at 347).

The circumstances here, however, are distinguishable from those in *Gingerich*. First, the plaintiff in *Gingerich* sought factual information through an interrogatory directed to a non-attorney party whereas the City is soliciting witness interview summary information from a non-party attorney through deposition questions. Second, the information the City seeks from Polansky is more akin to the oral statements and summaries deemed protectable through *Hickman* and *Upjohn* than the facts sought through the *Gingerich* interrogatory. Third, the City not only knows that Ervin is the witness Polansky interviewed but has also interviewed Ervin directly and secured Ervin's Declaration about the 1996 robbery, the photo array presented by Polansky at his 2004 interview, and Ervin's identification of Cooper.

Thus, the Polansky deposition questions open a different can of worms than the *Gingerich* interrogatory. Through its deposition questions, the City claims to seek only

the facts of what Ervin told Polansky at the 2004 interview about the 1996 robbery and the identification of Cooper from photos. Polansky's answers to those questions, however, reveal the questions he chose to ask Ervin as part of his investigation into matters relevant to Cooper's PCR proceedings if only implicitly. In other words, Polansky's deposition testimony would necessarily disclose his own oral summary, comparable to a written note or memorandum, of his investigative efforts in preparation for litigation of Cooper's post-conviction review. *Cf. Sandra T.E.*, 600 F.3d at 622 ("Work-product protection applies to attorney-led investigations when the documents at issue can fairly be said to have been prepared or obtained because of the prospect of litigation." (internal quotation omitted)); *1100 West, LLC v. Red Spot Paint & Varnish Co., Inc.*, No. 1:05-cv-1670-LJM-WTL, 2007 WL 2904073, at *2 (S.D. Ind. May 18, 2007) ("documents created by [a party's agent or attorney] during the course of . . . litigation that reflect which potential witnesses [an investigator hired by counsel] has interviewed, the questions he chose to ask them, and his notes regarding their answers are classic work product; so, too, are the affidavits that [the investigator] drafted summarizing his understanding of the witnesses' statements."). Accordingly, the information that the City seeks from Polansky qualifies as fact work product. The question remains, however, whether that work product is discoverable.

### 4. Protectability of Polansky's Fact Work Product

Fact work product is only discoverable if the requesting party—in this case the City—shows a "substantial need for the materials to prepare its case and [that it] cannot, without undue hardship, obtain their substantial equivalent by other means."

Fed. R. Civ. P. 26(b)(3)(ii).[6] The City argues that it has a substantial need for the information about the 2004 Polansky-Ervin interview because of Cooper's approach to this litigation[7].

The record is clear that the J Hat, and any link its shares with the Kershner scene and the Benton Harbor robbery, will be a key fact litigated in this case. Yet the record includes conflicting evidence from Ervin, Nelums, and Edwards about the Benton Harbor robbery bringing Ervin's November 2018 Declaration into question. Thus, comparing Ervin's statements about the Benton Harbor robbery to Polansky in 2004 with his 2018 Declaration and Nelums' August 2019 Affidavit stating that the Benton Harbor robbery did not occur would, as the City suggests, tend to be helpful to a trier of fact. Additionally, Bailey testified at his deposition in December 2020 that he does not recall any visit to Ervin in 2004 or any assignment from Polansky at that time. [DE 234-3 at 3]. Therefore, absent uncovering any other evidence, Polansky is the only arguably neutral resource available to corroborate or contradict Ervin's Declaration. In other words, Polansky's testimony may provide the City with critical impeachment evidence against Cooper.

---

[6] Cooper contends that the City waived any substantial need argument by not raising it in its memorandum in support of its Motion to Compel. Indeed, undeveloped arguments are waived. *United States v. Parkhurst*, 865 F.3d 509, 524 (7th Cir. 2017). Here, however, the City argued that the information at issue does not constitute work product. Therefore, the City's substantial need argument was properly raised for the first time in response to Cooper's response brief.

[7] The City also challenges Cooper's objection to soliciting Polansky for information regarding the 2004 Ervin Interview based on Cooper's February 2019 response to the City's Request for Admission No. 10 directing the City to Bailey or Polansky for that information. [DE 234-5 at 4]. However, Cooper's counsel reported in a letter to the City's counsel dated October 21, 2019, that amended responses would follow identifying Ervin as the proper witness regarding the 2004 interview. [DE 221-16 at 4]. Therefore, the City was at the very least on notice that Polansky was not the proper witness negating its argument here.

Yet impeachment alone is not a sufficient basis for invading the work product privilege. *Sandra T.E.*, 600 F.3d at 622–23. "A court is not justified in ordering a litigant to permit his adversary to inspect witness statements, which he has procured in preparing for trial, upon the adversary's mere surmise or suspicion that he might find impeaching material in the statements." *Id.* (quoting *Hauger v. Chi., Rock Island & Pac. R.R. Co.*, 216 F.2d 501, 508 (7th Cir. 1954)). Moreover, an attorney's notes—or in this case his testimony—cannot be used simply to impeach a witness when the witness himself could have been deposed. *Id.* (citing *Gay v. P.K. Lindsay Co.*, 666 F.2d 710, 713 (1st Cir. 1981). Accordingly, Cooper contends that Polansky's work product need not and should not be disclosed because the same information is available from Ervin himself.

Notably, Ervin refused to testify at two noticed depositions. Why the parties, especially the City, have not made greater efforts to obtain Ervin's deposition testimony is not evident from the briefs here. Similarly, the briefs offer no explanation for Ervin's refusal to appear at a deposition. Nevertheless, the City reasonably anticipates that Cooper will call Ervin as a witness at trial to prove his claim that the City engaged in deceit or undue influence when securing Ervin's Declaration. With this evidentiary battle presumably looming, the City contends that it has substantial need for Polansky's testimony related strictly to what Ervin told him and what pictures Ervin identified on April 16, 2004, to defend itself at trial.

A decision to invade work product protection should not be taken lightly. This case, however, presents a confluence of circumstances that both establish the City's substantial need for Polansky's work product and its inability to obtain the same

14

information through other means without undue hardship. The claims and defenses in this case demand discovery generally into events spanning 22 years including the Kershner robbery and shooting followed by Cooper's conviction in 1997; the alleged Benton Harbor robbery in 1996; Cooper's former attorney's investigation in 2004; and the written testimony of Ervin, Nelums, and Edwards in 2018 and 2019. The relevant facts are numerous. Memories continue to decay. One defendant has died since the inception of the case. And key witnesses appear to be protecting their own interests by refusing to testify at depositions. Taken together, this unusual set of circumstances presents more obstacles than open doors to the truth surrounding Cooper's 1997 conviction. Yet Polansky holds presumably reliable evidence that will assist the trier of fact in this case and foster greater confidence in the outcome by minimizing any prejudice these unusual circumstances create for the parties, especially the City, in making or defending against the claims in Cooper's complaint.

### 5.    Motion to Compel Conclusion

With no other available source for a substantial equivalent of Polansky's testimony, the City has established that this is one of those rare cases where invading the protection afforded by the work product doctrine is warranted. *Eagle Compressors*, 206 F.R.D. at 478; *cf. Hickman*, 329 U.S. at 513–14. Accordingly, the City's Motion to Compel is **GRANTED IN PART**. [DE 197]. To minimize the risk of exposing protectable thought processes or mental impressions, Polansky is **ORDERED** to produce written responses to the following two questions:

(1) What did Ervin tell Polansky on April 16, 2004?

(2) What pictures did Ervin identify on April 16, 2004?

Polansky may consult any of his notes or files in preparing his responses but need not disclose them to the City.[8]

### B.     The City's Motion to Seal [DE 200]

Along with its Motion to Compel, the City filed a Motion to File Certain Exhibits Under Seal. Specifically, the City asks that its Exhibits 19 and 20 [DE 201-1 and 201-2] accompanying its memorandum in support of its Motion to Compel be maintained under seal because they may contain privileged information. Since the Motion to Seal was filed, the City's Motion to Compel was mooted as to the issues related to Exhibits 19 and 20. [*See* DE 221 at 15]. Accordingly, good cause exists to maintain Exhibits 19 and 20 under seal as they are not relevant to the remaining disputes in the City's Motion to Compel. *See Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944 (7th Cir. 1999). Therefore, the City's Motion to Seal is **GRANTED**. [DE 200].

### C.     Cooper's Motion for Additional Requests to Admit [DE 206] and the City's Motion to Strike Plaintiff's Requests for Admission, Dkt. #206 [DE 208]

#### 1.     Relevant Background

In the original Rule 16(b) Scheduling Order governing this case, the discovery plan established a deadline for "the completion of all discovery" and, among other things, authorized each party to "serve a maximum of . . . 30 requests for admission on

---

[8] Notably, this Order merely finds that Polansky's responses are discoverable. The question of whether any of the information gleaned from Polansky is admissible at trial is reserved for the trial judge to resolve, as needed, as part of his gatekeeping function through appropriate pre-trial motions and/or objections.

any other party." [DE 28 at 1]. The Court's attached "Explanation of Scheduling Order" stated that "[a]ll discovery other than depositions must be initiated at least forty-five dates before the [discovery] cut-off date." [*Id.* at 3].

On agreement of the parties, the Court amended the Scheduling Order on January 21, 2020, adding a fact discovery deadline and extending the expert disclosure deadlines and the deadline for the close of all discovery. [DE 175]. The Scheduling Order was amended further on December 16, 2020, establishing the current deadlines of April 2, 2021, for completion of all fact discovery followed by expert disclosure deadlines and a July 1, 2021, deadline for the completion of all discovery. [DE 195].

As the fact discovery deadline approached, the parties coordinated approximately two dozen depositions between February and April 2, 2021. Among those deposed were Defendant Tom Cutler on February 19, 2021, and Defendant Edward Windbigler on February 22, 2021. During both depositions, Defendants challenged the foundation of documents maintained by the City. Surprised by the objections, Cooper's attorneys reviewed all the documents produced in this case and prepared 93 requests for admission ("RFAs") directed to the City and 148 RFAs directed to Defendant Estate of Rezutko. On March 1, 2021, Cooper filed the instant motion for additional RFAs with his proposed 241 RFAs attached. [DE 206].

In response, the Estate objected to Cooper's motion on grounds that the RFAs are (1) untimely, (2) excessive, (3) unduly burdensome and harassing, and (4) superfluous or improper, at least in part. The City joined the Estate's response after filing a separate

Motion to Strike Plaintiff's Requests for Admission [DE 208] arguing that the RFAs

were untimely. Cooper's and the City's overlapping motions are addressed together.

2.      **Analysis**

Rule 36 of the Federal Rules of Civil Procedure governs requests for admission.

The Rule provides that

> [a] party may serve on any other party a written request to admit . . . the
> truth of any matters within the scope of Rule 26(b)(1) relating to . . . facts,
> the application of law to fact, or opinions about either; and . . . the
> genuineness of any described documents.

Fed. R. Civ. P. 36(a)(1). "The purpose of Rule 36 is to expedite the trial by determining

what issues are in genuine dispute and by resolving the issues which are not disputed."

*Berry v. Federated Mut. Ins. Co.*, 110 F.R.D. 441, 443 (N.D. Ind. 1986); *see also Escobedo v.*

*Ram Shirdi Inc.*, No. 10 C 6598, 2011 WL 13243990, at *2 (N.D. Ill. Mar. 16, 2011)

("Admissions are sought, first to facilitate proof with respect to issues that cannot be

eliminated from the case, and secondly, to narrow the issues by eliminating those that

can be.").

a.      **Timeliness**

The Estate and the City both argue that Cooper's proposed RFAs are untimely

pursuant to the Court's Scheduling Order because they were not served within 45 days

of the April 2, 2021, fact discovery deadline. Cooper argues that the 45-day window for

initiating written discovery does not apply to RFAs because they are not discovery

devices. The question of whether RFAs are discovery devices is not as easy to answer as

the parties suggest. Both sides rely upon nonprecedential district court opinions, many

of which do not explicate a rationale for a conclusion one way or the other, to support their position. Yet the Seventh Circuit, whose opinion would hold sway over this Court, intentionally reserved the question of "whether requests for admission are a discovery device or should be characterized otherwise." *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 606 n.2 (7th Cir. 2002). Thus, the question is an open one – at least within the Seventh Circuit.

However, an interesting analysis from the Northern District of Illinois, laden with fitting literary comparisons, thoughtfully considered the question and concluded, in essence, that RFAs are a bit of anomaly—not fitting neatly into the category of discovery or trial devices available under the Federal Rules of Civil Procedure. *Kelly v. McGraw-Hill Cos., Inc.*, 279 F.R.D. 470, 471–72 (N.D. Ill. 2012). In fact, the *Kelly* court found that the purpose of particular RFAs dictate whether they are governed by discovery management or trial management principles. *Id.* at 472 ("requests to admit come in what are two really different flavors [and] the fundamental difference between those two types of requests calls for very different treatment").

While *Kelly* is not binding authority on this Court, it presents a persuasive approach to the consideration of RFAs that is imminently more reasonable than the conclusory statements the parties invite the Court to adopt. Moreover, the City and Estate's timeliness argument does not succeed even if Cooper's proposed RFAs are discovery devices. Therefore, this Court will leave the question of whether RFAs constitute discovery devices for another day.

Assuming without deciding that the Scheduling Order mandated that all RFAs be served at least 45 days before the close of fact discovery, Cooper's RFAs should have been served before February 16, 2021. They weren't. However, Cooper has shown that the foundational issues surrounding many of the documents held by the City were challenged for the first time during Cutler's and Windbigler's depositions on February 19th and 22nd—three and five days after the presumed deadline. Additionally, Cooper immediately began reviewing all documents produced in this case for similar concerns, drafted the proposed RFAs, and prepared the instant motion for additional RFAs all within ten days while simultaneously participating in other scheduled depositions. In so doing, Cooper's counsel exhibited due diligence in handling the newfound information. As a result, good cause exists to allow the arguably belated RFAs to ensure a fair result on the claims and defenses at issue in this case. *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 831 (7th Cir. 2016) (stating that the good cause standard "primarily considers the diligence of the party seeking amendment." (internal quotation omitted)); *see also* Fed. R. Civ. P. 1.

Notably, the City's sole argument in support of its motion to strike the RFAs is untimeliness. [DE 208 at 2]. Having found the RFAs to be sufficiently timely, the Court must **DENY** the City's motion to strike the RFAs. [DE 208].

### b.      Burden of Production on the City and the Estate

The City and the Estate argue that Cooper's RFAs are unduly burdensome because they are excessive in number and seek improper admissions.

### i.   Number of RFAs

Rule 36 itself provides no limit on the number of RFAs that can be propounded.

*See Escobedo*, 2011 WL 13243990, at *2 (citation omitted). However, "[r]equests to admit

should not be excessive in number and, obviously, should be tailored in a manner and

scope to avoid harassment and improper motive." *Tamas v. Fam. Video Movie Club, Inc.*,

301 F.R.D. 346, 347 (N.D. Ill. 2014) (quoting *Robinson v. Stanley*, 06 C 5158, 2009 WL

3233909, at *2 (N.D. Ill. Oct. 8, 2009)). As a result, "[c]ourts routinely disallow requests

for admission that run into the hundreds on the grounds that they are abusive,

unreasonable, and oppressive." *Robinson*, 2009 WL 3233909, at *2. Yet, "[b]ecause of the

relatively efficient, inexpensive, and conclusive nature of requests to admit, a court

should be reasonably certain of the existence of discovery abuse before it limits the

number or scope of requests to admit with regard to any matter otherwise

discoverable." *Sun Elec. Corp. v. Allen Group*, No. 82 C 7684, 1985 U.S. Dist. LEXIS 22571,

at *6 (N.D. Ill. Feb. 14, 1985). In other words, the appropriate number of RFAs in any

case is determined based on an assessment of the unique circumstances of the case

including the parameters of any applicable case management order, the content of the

RFAs themselves, and the complexity of the case.

Here, the Court adopted the parties' agreed limit of 30 RFAs per party in its

Scheduling Order. [DE 28 at 1]. Cooper therefore agreed to a total of 150 RFAs—30 to

each of the five defendants. Now he asks the Court not only to allow him to redistribute

all his RFAs to only two of the defendants—the City and the Estate—but also to

increase his total number of RFAs to 241. In support, he argues that discovery was

voluminous in this case necessitating a large number of RFAs "to simplify and streamline trial" and that RFAs are one of the few remaining methods of establishing liability against Steve Rezutko after his death. [DE 226 at 9–10].

At first blush, Cooper's arguments seem reasonable. Indeed, one of the key purposes of Rule 36 RFAs is simplifying issues for trial. *See, e.g.*, *Berner v. Outdoor Env'ts Grp., LLC*, No. 1:09-cv-00685-SEB-JMS, 2010 WL 98706, at *2 (S.D. Ind. Jan. 8, 2010). Moreover, there is no denying that all the parties in this action have been hampered in their ability to litigate their positions by Mr. Rezutko's unexpected death such that RFAs may be a useful alternative method of proof. However, Cooper has offered no meaningful explanation why he could not accomplish those same goals with the 150 RFAs already authorized—even if redistributed among the defendants. Without more, Cooper has not established good cause, as required by Fed. R. Civ. P. 16(b)(4), to amend the Scheduling Order to allow for 241 RFAs distributed between only two defendants.

Therefore, the Court **DENIES** Cooper's motion for additional RFAs **IN PART** [DE 206] and limits him to 150 total RFAs. However, Cooper may redistribute those 150 RFAs among the defendants as he chooses. Even so, all of Cooper's RFAs must comply with the substantive goals and requirements of Rule 36, as discussed further below.

### ii.    Propriety

In opposing Cooper's motion for additional RFAs, the Estate argues that many of the proposed RFAs are unanswerable. Specifically, the Estate challenges Cooper's RFAs 58–68 and 117–18, which ask for an admission that one non-party made certain statements to another non-party during criminal investigations. The Estate explains that

the communications at issue are recorded in the 1996 and 2001 internal affairs investigations reports and that it can attest to their inclusion in those reports but has no personal knowledge as to whether the statements were actually made as these RFAs request. Similarly, the Estate contends that it could only speculate as to RFAs 72–80, 100, 102–05, 107–09, 111–12, 114–16, and 123–24 seeking admission that Mr. Rezutko made certain statements to non-parties during specific investigations. The Estate also objects to these RFAs because answering them would require further discovery unlikely to result in definitive conclusions.

The Estate's substantive objections here are misplaced. Rule 36 requires an answer to RFAs in the form of an admission, a denial, a detailed statement why the RFA cannot be truthfully admitted or denied, or an objection. Fed. R. Civ. P. 36(a)(4)–(5). Rule 36 does not provide any opportunity for an answering party to ask the Court to quash RFAs. Only the requesting party has formal recourse to the Court through Rule 36, which allows the requesting party to "move to determine the sufficiency of an answer or objection." Fed. R. Civ. P. 36(a)(6). Thus, the Estate's objections above are more properly incorporated into its answers to the RFAs.

Notably, Rule 36(a)(4) only allows answering parties to "assert lack of knowledge or information as a reason for failing to admit or deny . . . if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." "What constitutes 'reasonable inquiry' and what material is 'readily obtainable' depends upon the facts of each case." *Hanley v. Como Inn, Inc.*, No. 99 C 1486, 2003 WL 1989607, at *2 (N.D. Ill. Apr. 28, 2003)

(citation omitted). "Under certain circumstances, parties may be required to inquire of third parties to properly respond to requests to admit." *Id.* Generally, however, a reasonable inquiry is limited to review and inquiry of those persons and documents that are within the responding party's control." *Id.* Thus, the Estate's lack of personal knowledge alone is an insufficient reason for failing to answer an RFA.[9] The Estate must make a reasonable inquiry into the issues presented in the RFAs to inform its answer or lack thereof under Rule 36.

The Estate further objects to Cooper's RFAs 133–48 seeking admissions that Mr. Rezutko gave certain testimony in other litigation as well as admissions regarding the discovery requests and responses, pleadings and other filings, and court orders in this action. The Estate contends that these RFAs seek irrelevant information, information already admissible, or information with no evidentiary purpose. As the Estate states, "[w]hether and when a party served Interrogatories, letters exchanged between counsel, what the Court has ordered, and when discovery responses and filings were due are not 'facts at issue' in the case . . . ." [DE 213 at 7]. Moreover, other mechanisms are available to streamline the trial on these issues, should they require litigation. For instance, stipulations are a common tactic used to support summary judgment motions and to

---

[9] The Estate cites *Exec. Mgmt. Servs., Inc. v. Fifth Third Bank*, 2016 WL 3129528, at *2 (S.D. Ind. Feb. 26, 2016) asserting that the court sustained an objection to an RFA because the responding party could not "have personal knowledge of what another party knows." [DE 213 at 5]. However, careful reading of the entirety of the case shows that the court considered the responding party's "lack of personal knowledge" objection but ultimately held that the RFAs were objectionable because they sought "admission to multi-faceted disputed facts within [the] litigation" rather than "simple and direct facts" as contemplated by Fed. R. Civ. P. 36.

limit testimony at a trial. Alternatively, the Court can take judicial notice of any relevant adjudicative facts. *See* Fed. R. Evid. 201.

### 3.   Conclusion as to Cooper's Motion for Additional RFAs

As discussed above, Cooper's RFAs served on March 1, 2021, were not untimely, but they were excessive in number and likely excessive in scope, at least in part. Accordingly, Cooper's Motion for Additional RFAs is **GRANTED IN PART**. [DE 206]. Cooper may serve 150 of his proposed RFAs, distributed as he chooses among the five defendants. Cooper is **ORDERED** to revise his selected proposed RFAs to avoid any sustainable objections by Defendants based upon the standards set forth in this Opinion and Order.[10] Defendants must answer the RFAs consistent with the requirements of Rule 36 and the deadlines set forth below.

### D.   Non-Party Christofeno's Motion to Quash Non-Party Subpoena and for Entry of Protective Order [DE 232]

#### 1.   Relevant Background

Non-party Michael A. Christofeno currently serves as Judge for 34th Judicial Circuit (Elkhart County, Indiana), after being elected to the office on November 8, 2016, and assuming the bench in January 2017. In or around 1997, Christofeno served as a deputy prosecuting attorney for Elkhart County, Indiana. In that role, he prosecuted the State's criminal case against Cooper that resulted in his conviction for the Kershner

---

[10] Cooper is also reminded that "[u]nder Rule 36, requests for admission should be simple and direct so that they can be readily admitted or denied." *Climco Coils Co. v. Siemens Energy & Automation, Inc.*, No. 04 C 50342, 2006 WL 850969, at *1 (N.D. Ill. Mar. 28, 2006) (footnote omitted). Among the proper purposes for RFAs is determining whether documents to be introduced at trial will have foundational problems. *Berry*, 110 F.R.D. at 443. Yet a party's current state of knowledge of facts, which is neither relevant nor probative of any matter, is not a proper subject of an RFA. *Nutmeg Grp.*, 285 F.R.D. at 405. Similarly, an RFA is improper if it asks a party to admit the opposing party's theory of the case. *Id.*

robbery and shooting. On January 13, 2016—about ten months before being elected judge, Christofeno sent a letter as a private citizen to then Indiana Governor Mike Pence in support of Cooper's pending petition for pardon.

In January 2021, Cooper's counsel initiated conversations with Judge Christofeno, through counsel, in an attempt to schedule his deposition. Cooper would like to depose the Judge as a fact witness about what evidence the Defendant Officers here disclosed to him when he was prosecuting Cooper's criminal case back in the 1990s. Cooper has also expressed interest in Christofeno's communications and interactions with the Defendant Officers as well as his practice in maintaining the prosecutor's file. Through counsel, the Judge declined to sit for a deposition citing the duties and restrictions placed on trial court judges in the State of Indiana. Yet on March 3, 2021, Cooper proceeded and served Judge Christofeno with a subpoena for a virtual deposition to be held on April 2, 2021. When Cooper refused to withdraw the subpoena, Judge Christofeno filed the instant Motion on March 30, 2021.

In support of his Motion, Judge Christofeno argues that (1) the subpoena poses an undue burden on him; (2) the testimony Cooper seeks is disproportional to the needs of this case; (3) the subpoena is untimely; and (4) the subpoena improperly seeks privileged investigatory and work product materials. Accordingly, Judge Christofeno asks that the deposition subpoena be quashed and that a protective order be entered shielding him from providing any testimony in this case. Cooper rejects all of Judge Christofeno's arguments.

2.      **Analysis**

The scope of information discoverable under the Federal Rules is broad.

Specifically, Fed. R. Civ. P. 26(b)(1) permits discovery on any

> nonprivileged matter that is relevant to any party's claim or defense
> proportional to the needs of the case, considering the importance of the
> issues at stake in the action, the amount in controversy, the parties'
> relative access to relevant information, the parties' resources, the
> importance of the discovery in resolving the issues, and whether the
> burden or expense of the proposed discovery outweighs its likely benefit.

Parties may also seek written or oral discovery from non-parties through subpoenas

issued consistent with the requirements of Fed. R. Civ. P. 45. "The scope of material that

is obtainable through a subpoena is as broad as that which is otherwise permitted under

the discovery rules." *Teton Homes Europe v. Forks RV*, No. 1:10-CV-33, 2010 WL 3715566,

at *2 (N.D. Ind. Sept. 14, 2010). The court must quash or modify a subpoena that

"requires disclosure of privileged or other protected matter . . . or subjects a person to

undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). "The party seeking to quash a

subpoena under [Rule 4(d)(3)(A)] bears the burden of demonstrating that the

information sought is privileged or subjects a person to an undue burden." *Malibu*

*Media, LLC v. John Does 1–14*, No. 1:12-CV-263, 2013 WL 2285950, at *2 (N.D. Ind. May

22, 2013).

Further, "the court may, for good cause, issue an order to protect a party or

person from annoyance, embarrassment, oppression, or undue burden or expense," up

to and including forbidding the discovery. Fed. R. Civ. Pro. 26(c)(1). "Rule 26(c) confers

broad discretion on the trial court to decide when a protective order is appropriate and

what degree of protection is required." *Ball Corp. v. Air Tech of Mich., Inc.*, 329 F.R.D. 599, 603 (N.D. Ind. 2019) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)). Judge Christofeno's Motion succeeds upon his showing of undue burden.

"[C]alling a judge to give testimony in any proceeding is a very delicate matter." *United States v. Frankenthal*, 582 F.2d 1102, 1107 (7th Cir. 1978). A witness's judicial status is likely to provide the imprimatur of prestige, dignity, and authority to a party's case, and is likely to lead a fact-finder to misinterpret the judge's testimony as an official testimonial. *See id*. at 1108; *see also* Leslie W. Abramson, *Canon 2 of the Code of Judicial Conduct*, 79 MARQ. L. REV. 949, 977 (1996) ("When a judge testifies, there is concern that the judge not only is presenting evidence, but also is conferring the prestige and credibility of judicial office on a litigant's position."). Therefore, judicial testimony is presumptively highly prejudicial.

Moreover, judicial testimony raises ethical concerns. Relevant here is the Indiana Code of Judicial Conduct ("Judicial Code"), which governs Judge Christofeno's conduct in his role as a Circuit Judge. Three rules in particular raise concerns for Judge Christofeno's potential testimony in this action—Rule 1.3, 2.10(A), and 3.3.

> **RULE 1.3: Avoiding Abuse of the Prestige of Judicial Office**
> A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.
> . . . .
> **RULE 2.10: Judicial Statements on Pending and Impending Cases**
> (A) A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court, or many any nonpublic statement that might substantially interfere with a fair trial or hearing.
> . . . .

28

**RULE 3.3: Testifying as a Character Witness**
A judge shall not testify as a character witness in a judicial, administrative,
or other adjudicatory proceeding, except when duly summoned.

Ind. Code Jud. Conduct (2020), *available at* https://www.in.gov/courts/rules/ (last

visited Feb. 3, 2022).

As Cooper notes, Rule 1.3 and 2.10(A) do not expressly prohibit judges from

testifying in litigation and Rule 3.3 only prohibits testimony as a character witness when

the judge has not been duly summoned. Thus, Cooper concludes—after reviewing the

plain language of the rules and the accompanying comments—that Judge Christofeno

would not be violating these rules if he were to testify consistent with the subpoena.

What Cooper fails to consider, however, is the ethical principles underlying all the rules

included in the Judicial Code.

The Code's preamble starts by stating that "[i]nherent in all the Rules contained

in this Code are the precepts that judges, individually and collectively, must respect and

honor the judicial office as a public trust and strive to maintain and enhance confidence

in the legal system." *Id.*, Preamble [1]. The preamble further explains that "[j]udges

should maintain the dignity of judicial office at all times, and avoid both impropriety

and the appearance of impropriety in their professional and personal lives [aspiring] at

all times to conduct that ensures the greatest possible public confidence in their

independence, impartiality, integrity, and competence." *Id.* at [2]. The preamble

concludes by advising judges that the Code "is not intended as an exhaustive guide"

and that they are to be "governed in their judicial and personal conduct by general

ethical standards as well as by the Code." *Id.* at [3]. More practically, the Code explains

that the comments accompanying the rules themselves "neither add to nor subtract from the binding obligations set forth in the Rules." *Id.*, Scope [3]. Describing the Code as aspirational, it also encourages judges to "strive to exceed the standards of conduct established by the Rules, holding themselves to the highest ethical standards and . . . thereby enhancing the dignity of the judicial office." *Id.* at [4].

Thus, this Court must assume that, based on the admonitions of the Judicial Code, Judge Christofeno has properly considered ethical rules that could implicate his testimony and the broad underlying principles envisioned in the Canons of the Judicial Code.[11] First, Cooper expressly intends to use the Judge's testimony to further his personal interest in prevailing in this case. Arguably, Cooper is not interested in the testimony of Christofeno in his capacity as a judge, but in his capacity as a former deputy prosecuting attorney. This is a distinction without a difference now that Christofeno has become a judge. Christofeno's judicial office is attached to him in every capacity—even those disconnected from his professional life. The risk that a fact finder would be more influenced by Judge Christofeno's testimony given his office than other evidence is real and cannot be mitigated completely no matter the warnings afforded. Thus, testifying as Cooper requests puts Judge Christofeno in conflict with Rule 1.3

---

[11] Most applicable here are Canons 1–3.

 Canon 1: A Judge Shall Uphold and Promote the Independence, Integrity, and Impartiality of the Judiciary, and Shall Avoid Impropriety and the Appearance of Impropriety.

 Canon 2: A Judge Shall Perform the Duties of Judicial Office Impartially, Competently, and Diligently.

 Canon 3: A Judge Shall Conduct the Judge's Personal and Extrajudicial Activities to Minimize the Risk of Conflict with the Obligations of Judicial Office.

Ind. Code of Jud. Conduct (2020).

because his judicial office would be used, even unintentionally, to advance one side's interest in this case.

Second, and similarly, Cooper intends to use Judge Christofeno's testimony to prove or create the inference that, Defendant Officers did not deliver exculpatory evidence to him as he was prosecuting Cooper's criminal case—a key point for Cooper in making his claims in this case. To use that arguably valuable evidence, Cooper would have to present Judge Christofeno's testimony to the Court either in support of a motion for summary judgment or as evidence at a trial. Accordingly, Cooper's attempt to distinguish deposition testimony from the "public statement" prohibition in Rule 2.10(A) is unavailing. After all, judicial proceedings are public by their very nature and judges, including the undersigned, serve as the primary protector of the public's interest in the judicial process. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, *178 F.3d 943, 945 (7th Cir. 1999)*. Moreover, Cooper's case has been and will likely remain in the public eye through the media. Thus, while Judge Christofeno's deposition may not be open to the public at the time it is taken, his testimony is likely to become public later in this litigation thereby implicating Rule 2.10(A)'s directive against public statements related to pending cases in any court.

Lastly, Judge Christofeno argues that Rule 3.3's caveat against character testimony could be implicated if he is deposed. While there is no doubt that Judge Christofeno's testimony would be draped in the authority of his office and could therefore be perceived as a statement on either Cooper's character or the character of the Defendant Officers, the risk of discipline for violating Rule 3.3 appears less than for

the other two rules discussed. Cooper asserts that he would not be calling Judge Christofeno as a character witness and that Judge Christofeno has been duly summoned making a Rule 3.3 violation impossible. Nevertheless, Canon 3 of the Judicial Code, which undergirds Rule 3.3, is at play.

Canon 3 states that "a Judge shall conduct the Judge's personal and extrajudicial activities to minimize the risk of conflict with the obligations of judicial office." Judge Christofeno's testimony would constitute either personal or extrajudicial activity because it is not related to his duties and obligations as Elkhart County Circuit Judge. And Cooper's contrary perspective notwithstanding, Judge Christofeno's testimony here carries a risk of conflict with his obligations as Elkhart County Circuit Judge. Human nature suggests that attorneys involved in questioning Judge Christofeno would be cognizant of his position and their practice in his court on other matters. Moreover, knowledge of Judge Christofeno's testimony in this case could affect how attorneys perform before him in other cases. Thus, there is a risk of a chilling effect on attorney conduct now and later. Additionally, future litigants before Judge Christofeno, pursuing claims similar to Cooper's here, could reasonably question Judge Christofeno's neutrality thereby complicating the flow of his court's work. Even if, as argued by Plaintiff, these risks of conflict with Judge Christofeno's obligations to his court duties are remote, they create a substantial appearance of impropriety at the very least.

In sum, Judge Christofeno risks running afoul of the Indiana Code of Judicial Conduct by testifying in this case. Whether he would necessarily face discipline for

testifying is unknown and irrelevant. His testimony creates risks to his own professional reputation, to his judicial office, to his judicial colleagues, to attorney practicing before him, and to future litigants in his court that clash with the ethical principles and aspirational precepts espoused in the Judicial Code. That risk, arising from Cooper's subpoena, poses an undue burden on Judge Christofeno.

Moreover, Judge Christofeno need not endure that burden when the information Cooper seeks from him can be obtained through other means. Judge Christofeno's testimony is not the only evidence available to Cooper to either prove or establish an inference as to whether the Defendant Officers disclosed exculpatory evidence to him during the prosecution of Cooper's case. All that Judge Christofeno could testify to is whether exculpatory evidence was in his prosecutor's file—not who did or did not disclose it to him. That same circumstantial evidence is already in the investigation file, which Cooper acknowledges he already possesses. Thus, Judge Christofeno's testimony would only serve as unnecessary, cumulative evidence.[12]

Additionally, Christofeno's communications and interactions with the Defendant Officers on Cooper's case as well as his practices related to the maintenance of the prosecutor's file may be inaccessible to Cooper if they qualify as privileged. Specifically, Judge Christofeno argues that these broad categories of information appear to fall under the law enforcement investigatory privilege and the work product doctrine.

---

[12] In this context, the Court cannot help but wonder if Cooper is hoping that Judge Christofeno's testimony would be more valuable to a fact-finder in reaching the inference he is promoting given his status as a judge.

The investigatory privilege is not absolute but exists "to prevent disclosure of law enforcement techniques and procedures, to preserve confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise prevent interference in an investigation." *Szany v. City of Hammond*, No. 2:17-CV-74-PPS-JPK, 2019 WL 3812492, at *1 (N.D. Ind. Aug. 14, 2019) (internal quotations and citations omitted). However, the privilege "can be overridden in appropriate cases by the need for the privileged materials." *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997). In determining whether to allow disclosure of investigative materials, a court must balance "the need of the litigant who is seeking privileged investigative materials . . . against the harm to the government if the privilege is lifted . . . ." *Id.* There is a strong presumption against lifting the privilege. *Id.*

In assessing whether the investigatory privilege applies, courts weigh ten factors. *Szany*, 2019 WL 3812492, at *1–*2 (quoting *Davis v. Carmel Clay Sch.*, 282 F.R.D. 201, 206 (S.D. Ind. 2012); accord *Anderson*, 220 F.R.D. at 563-64; *Jones v. City of Indianapolis*, 216 F.R.D. 440, 444 (S.D. Ind. 2003)). The problem here is that Cooper has not presented enough detail as to what information he seeks from Christofeno on these topics to apply the factors and balance the relevant interests. Thus, the Court cannot discern with certainty whether the investigatory privilege would apply.

Similarly, the limited record before the Court precludes any final conclusion as to the applicability of the work product doctrine to the communications and interactions with the Defendant Officers and to practices related to maintaining prosecutor's files.

34

The analysis of the Polansky subpoena above, however, suggests that Christofeno's testimony could be protectable work product because he would likely have to rely on old notes to answer Cooper's questions about the investigation. *See Upjohn*, 449 U.S. at 399 (citing *Hickman*, 329 U.S. at 513, 516–17).

Given the cumulative nature and potentially privileged nature of the information Cooper seeks from Judge Christofeno, its proportionality to the needs of this case is uncertain at best. These proportionality concerns only increase the burden testifying would put on Judge Christofeno as a non-party without sufficient showing from Cooper to justify imposing that burden. Cooper's notice of deposition to Judge Christofeno was undeniably timely as it was served within the confines of the Rule 16(b) Scheduling Order. [*See* DE 28, 195]. Yet timeliness alone is not enough to overcome Judge Christofeno's instant Motion.

Accordingly, Judge Christofeno's Motion to Quash Non-Party Subpoena and for Entry of Protective Order is **GRANTED**. [DE 232]. The subpoena dated March 3, 2021 [DE 232-1] is **QUASHED**. Further, Judge Christofeno is excused from testifying in this action at all.

### E. Cooper's Motion to Set Deadlines Through Trial [DE 246]

On August 11, 2021, with the above discovery-related motions all still pending, Plaintiff filed his Motion to Set Deadlines Through Trial. In response, the City agreed that new case management deadlines were needed but disagreed with the timing proposed by Cooper for those deadlines. With the scope of remaining fact discovery clarified through this Order, the Court **GRANTS IN PART** Cooper's

Motion. [DE 246]. To propel this aging case forward, the remaining discovery and dispositive motion periods are compressed from the parties' proposed deadlines. All trial-related deadlines will be set by the presiding judge following a status conference to be set by separate order.

The fact discovery period remains open until March 31, 2022, for the limited purposes of Polansky's written discovery responses to the City and Cooper's RFAs to Defendants as outlined above.[13] Rule 26(a)(2) expert disclosures are due from Cooper by April 14, 2022; and from Defendants by May 13, 2022. Rebuttal expert disclosures must be served by June 13, 2022, with the completion of all discovery by June 27, 2022. Dispositive motions must be filed by July 11, 2022, with responses due August 15, 2022, and replies due August 29, 2022.

Consistent with the mandate of Fed. R. Civ. P. 1 to secure a just, speedy, and inexpensive resolution of this action, the parties should anticipate that additional requests to modify the Rule 16(b) deadlines will not be considered favorably absent a showing of circumstances beyond the control of the parties and their counsel. This case must be prioritized by the parties and their counsel to reach as timely a resolution of all claims as possible.

---

[13] The Court **ACKNOWLEDGES** that the parties had some dispute over taking the depositions of Natasha Felton, Pamela Westlake, and Richard Moore. The City's represented in its response brief filed on August 25, 2021, that "[t]he parties agreed that the plaintiff will file a motion on any depositions he seeks to conduct and the defendants will respond accordingly." [DE 247 at 2]. To date, no such motion has been filed. Accordingly, the Court assumes that the depositions are no longer at issue.

III.   **CONCLUSION**

For the reasons discussed above, the Court now:

(1) **GRANTS** the City's Motion to Compel [DE 197] and **ORDERS** William Polansky to serve the City with written responses to the two questions outlined above on or before **March 18, 2022**;

(2) **GRANTS** the City's Motion to Seal [DE 200] and **DIRECTS** the Clerk to maintain the City's Exhibits 19 and 20 [DE 201, 201-1, and 201-2] under seal;

(3) **GRANTS IN PART** Cooper's Motion for Additional Requests to Admit [DE 206] and authorizes Cooper to serve RFAs on Defendants as outlined above no later than **February 18, 2022**, with answers due from served Defendants by **March 18, 2022**;

(4) **DENIES** the City's Motion to Strike [DE 208];

(5) **GRANTS** non-party Judge Christofeno's Motion to Quash Subpoena and for Entry of Protective Order [DE 232] as outlined above; and

(6) **GRANTS IN PART** the City's Motion to Set Deadlines Through Trial [DE 246] and **AMENDS** the Court's Rule 16(b) Scheduling Order [DE 28, 195] as follows:

- Fact discovery (as limited above)—**March 31, 2022**

- Plaintiff's expert disclosures—**April 14, 2022**

- Defendants' expert disclosures—**May 13, 2022**

- Rebuttal expert disclosures—**June 13, 2022**

- All expert discovery—**June 27, 2022**

- Dispositive motion deadline—**July 11, 2022**

- Responses to dispositive motions—**August 15, 2022**

- Replies regarding dispositive motions—**September 2, 2022**

**SO ORDERED** this 10th day of February 2022.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge